# EXHIBIT 3

1  LATHAM & WATKINS LLP
     Daniel Scott Schecter (Bar No. 171472)
2      *daniel.schecter@lw.com*
     Jessica Stebbins Bina (Bar No. 248485)
3      *jessica.stebbinsbina@lw.com*
     Elizabeth A. Greenman (Bar No. 308488)
4      *elizabeth.greenman@lw.com*
   10250 Constellation Boulevard, Suite 1100
5  Los Angeles, California 90067
   Telephone:  (424) 653.5500
6  Facsimile:   (424) 653.5501

7  Attorneys for Petitioner
   Harmony Gold, USA, Inc.
8
   LAW OFFICES OF HAROLD J. LIGHT
9  Harold J. Light
   hallight@hjllaw.com
10 11355 West Olympic Boulevard, Suite 300
   Los Angeles, California 90064
11 Telephone:  (310) 473.2233

12 Attorney for Respondent
   Tatsunoko Production Co., Ltd.

13

14                    UNITED STATES DISTRICT COURT

15                   CENTRAL DISTRICT OF CALIFORNIA

16

17                                    CASE NO.  2:17-cv-06034-PA-MRW

18 HARMONY GOLD, USA, INC.,          **AMENDED JUDGMENT**

19          Petitioner,              **CONFIRMING ARBITRATION**

20       v.                          **AWARD**

21 TATSUNOKO PRODUCTION CO.,
   LTD.,
22
            Respondent.
23

24

25

26

27

28

1     The Petition to Confirm Arbitration Award (the "Petition") brought by

2  petitioner Harmony Gold, USA, Inc. ("Petitioner") is pending before the Court.

3  Having carefully considered the papers filed in support of the Petition, the Court

4  enters judgment as follows:

5

6     IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

7     That the Arbitration Award issued by the Independent Film & Television

8  Alliance on June 28, 2017 in connection with the arbitration proceedings between

9  Petitioner and Tatsunoko Production Co., Ltd., a true and correct copy of which is

10 attached hereto as Exhibit A, is the Judgment of this Court.

11

12    Pursuant to California Civil Code section 3287, the parties are entitled to

13 recover prejudgment interest on any unsatisfied amount of money ordered to be

14 paid in the Arbitration Award which accrued between June 28, 2017 and the date

15 of this judgment at the statutory rate.

16

17    IT IS SO ORDERED.

18

19

20 Dated:  August 23   , 2017

21                                              Hon. Percy Anderson
                                               United States District Judge

22

23

24

25

26

27

28

# EXHIBIT A

## BEFORE THE ARBITRATION TRIBUNAL OF
## THE INDEPENDENT FILM & TELEVISION ALLIANCE

| | |
|---|---|
| In the Matter of Arbitration between | CASE NO. 16-75 |
| **Harmony Gold, USA, Inc.,** | |
| Claimant and Cross Respondent, | AWARD |
| and | |
| **Tatsunoko Production Co., Ltd.,** | |
| Respondent and Cross-Complainant. | |

This matter duly came on for Hearing on May 16, 2017 at 9:00 am before Jack E. Freedman, Arbitrator, at Claimant's offices, as agreed by the parties, continuing through and concluding on May 19, 2017.

Harmony Gold, USA, Inc., Claimant and Cross Respondent ("Claimant" or "Licensee") was represented by its counsel Jessica Stebbins Bina of Latham & Watkins LLP.  Tatsunoko Production Co., Ltd., Respondent and Cross-Complainant ("Respondent" or "Licensor") was represented by its counsel Harold J. Light of the Law Offices of Harold J. Light. Also present for Claimant were Leonard B. Rosman, Esq., Elizabeth A. Greenman, Esq., and Christy Duran, Esq., Vice President Business and Legal Affairs of Claimant and intermittently Diana Brown, Legal Assistant to Frank Agrama. For Respondent present were Bryan Murphy, Esq., Bruce Alan Gilbert, Esq., and Tatsunoko Director Administration Akihiro Harada and Masataka Haneda, Director Corporate Planning. A record of the proceedings was done by Sara McDonald of Veritext.

Claimant and Respondent were afforded the opportunity to appear and present their cases with four percipient and three expert witnesses testifying under oath. Over 600 documents were introduced into evidence including agreements,

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 2 of 21

communications between the parties, expert reports, audit reports and other relevant documents concerning issues relating to this Arbitration.

On June 5, 2017, the parties filed Closing Briefs and the matter was submitted for decision.

## BACKGROUND

### A. Agreements

This Arbitration arises out of a License Agreement entered into between the parties, Claimant as Licensee and Respondent as Licensor thereunder, dated March 15, 1991, (herein "1991-LA") wherein Licensor granted to Licensee the exclusive and irrevocable right to exploit three Japanese animated television series known as (a) *Macross* – 36 episodes, (b) *Mospeada* – 25 episodes and (c) *The Southern Cross* – 23 episodes for a term of ten years (herein the "Programs" or individually by their names). Subsequently, the Parties entered into an amendment to the 1991-LA, dated August 6, 1998, (herein "1998-A") extending the term for an additional ten years through March 14, 2011 and a further amendment to the 1991-LA, dated June 28, 2002, (herein "2002-A") extending the term to March 14, 2021. Additionally, another amendment was entered into on January 20, 2003 related not to the term but wherein it was provided that "For good and valuable consideration, the receipt of which is hereby acknowledged, Licensor hereby grants to Licensee whatever rights Licensor has (if any) in the copyright of the original 36 episode series *Macross*…" (herein "2003-A"), though the validity of this agreement is contested by Respondent. Lastly, there was an amendment dated March 20, 2008 (herein "2008-A"). These agreements along with other related but less relevant agreements and amendments, subsequent to the 1991-LA, are referred to herein as the "Operative Agreements".

Prior to entering into the 1991-LA, Licensor granted various rights to the Programs, similar to those included in the 1991-LA, to Harmony Gold, Ltd, a Hong

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 3 of 21

Kong company (herein "HG Ltd") commencing with an agreement dated September 11, 1984 (herein "1984-LA") which superseded a "deal" memorandum of the same date, (even an earlier agreement on January 15, 1984 with regards only to rights limited to merchandizing for *Macross)*, followed by numerous amendments and related agreements up until 1989 (herein "Original Agreements"), which rights under the Original Agreements were ultimately transferred and assigned by HG Ltd to Claimant in two steps first in late 1984 and then in late 1985. This Arbitration deals primarily with the Operative Agreements, however, reference to some or all of the Original Agreements, as the parties have done, may be beneficial to grant the relief requested and/or serving to inform understanding. It is especially noteworthy that it was pursuant to the 1984-LA that the derivative works listed in B. (a), (b) and (c) below were produced by Licensee.

## B. Derivative Works

Produced derivative works were initially in English based on the Programs pursuant to the Original Agreements as follows: (a) Robotech in 1985; (b) Robotech II, The Movie in 1986, and (c) Robotech II, The Sentinels in 1988 and pursuant to the Operative Agreements (d) The Shadow Chronicles in 2006. Also, non-motion picture derivative works such as comics, video games and books were produced throughout.

1985 Robotech consisted of 85 television episodes using no new footage

1986 Robotech was a movie using additional 3rd party footage, some new animation and a new story.

1988 Robotech consisted of a three episode animated sequel to the earlier Robotech productions (released in '90 as a feature not episodically) written by Claimant with new animation contributed by Respondent.

2006 *The Shadow Chronicles* an animated sequel to earlier Robotechs as a continuation of the *Mospeada* story contained all new footage. The evidence showed

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 4 of 21

that none of the *Macross* underlying programs, characters or visual depictions

thereof were included therein.

All of the aforesaid produced derivative works are referred to collectively herein as

"*Robotech*" or by their individual date/title.

<u>Unproduced derivative works</u> included the following option/development deals for

live action motion pictures:

      2007 with Warner Bros., and 2016 with Columbia Pictures.


## C. Parties' History

Kenji Yoshida and Ippei Kuri founders and co-owners of Licensor Tatsunoko and their

trusted executive Koki Narushima have been dealing with Licensee founder Frank

Agrama for over thirty-three years regarding the Programs and other matters.

Tatsunoko's founders retired, over twelve years ago, after they sold their company

to a Japanese toy company Takara in 2005 which was again acquired in 2014 by

Japanese media company Nippon Television. Mr. Narushima, having been at

Tatsunoko starting in 1980, ultimately became President and CEO in 2005 under new

owner Takara until seven years ago in 2010 when he also retired. Mr. Narushima still

living in Japan, provided, at Claimant's request, a Declaration in this matter because

his age and health prevented him from traveling to this Arbitration. Mr. Agrama at

86 years old was only able, due to age and/or physical condition to testify for limited

periods during the mornings of the hearing.


## PROCEDURES

The 1998-A provides that it and the 1991-LA will be governed by the laws of the

State of California, U.S.A., and all disputes shall be resolved by binding arbitration

pursuant to the Rules for International Arbitration ("Rules") published by the

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 5 of 21

Independent Film and Television Alliance, previously the American Film Marketing Association, ("IFTA"), which Rules therefore applicable to this matter are those in effect on the effective date of the contract, i.e. Rules dated May 27, 1997, which establish the authority of the Arbitrator hereunder.

With respect to the procedural requirements pertaining to this matter, I find that arbitration of the dispute between the Parties was properly initiated, under the Rules, by Claimant's *Notice of Arbitration* dated November 22, 2016 responded to by Respondent, including counterclaims, on December 29, 2016 with a reply thereto from Claimant on January 23, 2017 to which Respondent replied on January 26, 2017. On February 2, 2017 the undersigned was appointed to act as the sole Arbitrator in this matter.

Arbitrator duly noticed and held a Preliminary Hearing on February 16, 2017 wherein, among other things, counsel presented their oral arguments, following written pleading, on the issue of proper parties.
After full consideration of the parties' arguments, a Ruling was issued by the Arbitrator on February 18, 2017 declaring that Claimant and Respondent were the only proper parties to this Arbitration and that HG Ltd was not a proper party.

A Ruling was also issued by the Arbitrator on May 3, 2017, after argument by the parties, permitting a Declaration by Koki Narushima to be admitted into evidence stating that "It will be up to the arbitrator to determine the proper weight to be accorded the Declaration, taking into account all other evidence and/or relevant circumstances". Surprisingly, the Declaration was introduced by and for the benefit of Claimant not Respondent for whom Koki Narushima had worked.

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 6 of 21

It should be noted for the record that in the Fall of 2013 a request was made by
Respondent to amend and restate the Operative Agreements which request was not
accepted by Claimant as, in its view, doing so would have drastically reduced its
rights. An audit (herein "Audit") was then demanded and when completed on July 7,
2016 the Respondent filed an arbitration which was withdrawn to attempt mediation
on November 9th and 11th of 2016 which mediation failed to reach an accord.


## FACTS, CLAIMS and ANALYSIS

Relating to the various claims, counterclaims and defenses, the following is a
summary of certain facts found by the Arbitrator to be true and relevant to the
decision.  Any differences between this summary and either of the parties' positions
or contentions are the result of the Arbitrator's determinations as to witness
credibility, relevance, burden of proof considerations, and the weighing of the
evidence, both oral and written. In addition, based on the documentary evidence,
witness testimony and arguments of counsel, the Arbitrator hereby provides the
following analysis relating to the sought after relief:

Big West Litigation

In or around 1998, Big West, a Japanese animation company (who along with
Studio Nue had co-produced *Macross* with Respondent), asserted that it, not
Respondent, owned the exclusive rights to make sequels based on *Macross*
which, if correct, would have denigrated rights licensed to Claimant. The court
ruled for Respondent in 2003 as confirmed in 2005 by the appellate courts except
for finding that Big West owned exclusively the original visual depictions of 41
characters as used in the *Macross* program. This substantial victory for
Respondent still left it in breach of its representations and warranties to Claimant
in the Operative Agreements (as to the visual depiction of the 41 characters)

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 7 of 21

wherein it had represented that the rights granted would not infringe in any way upon the rights of third parties.

## Derivative Rights including Live Action Rights & Exploitation Rights

In the Original Agreements, Respondent granted Claimant the exclusive right to make and exploit derivative works based on the Programs and to use the characters and stories contained therein. Those rights were exploited by Claimant by its making the derivative works and sequels listed in B. (a), (b) and (c) hereinabove. The 1991-LA, substantially a renewal of those rights contained in the 1984-LA, provides as follows:

"…Licensee is entitled to present, reproduce, record, publish, release, exhibit, distribute, perform, broadcast, diffuse, display, market, edit, dub, translate, arrange musically, transform, dramatize _and otherwise adapt and prepare derivative works,_ based on, advertise, and otherwise dispose of and exploit the underlying series, and any and all versions, character, stories, setting, titles, music, sound track and effects, animation, artwork and all other components thereof, _using any methods or devices of exploitation…_" (Emphasis added).

This language is clear in that it granted derivative rights of all kinds, including live action rights, not just animated derivative rights. The grant is express, broad and absolute not limited in any way to only animated derivatives. Further confirmation thereof was evident in Respondent's awareness without objection let alone encouragement of that process as well as by providing a legal opinion affirming that such production, as contemplated, would not infringe upon the rights of Big West. Despite Respondent's being aware of Claimant's attempts to make a live action derivative, the Respondent never demonstratively asserted that Claimant did not have live action rights until this controversy arose.

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 8 of 21

Additionally, as both the 1984-LA and 1991-LA made the parties joint copyright owners in the Programs the Licensee was also authorized to prepare derivative works based on that ownership.

The Operative Agreements also granted broad rights of exploitation of those works as follows:

"The Licensor hereby grants exclusively and irrevocably to the Licensee the rights to exploit the animated television programs...on the terms and conditions set out below, which rights include, but are not limited to, television broadcasting, merchandizing exploitation, theatrical and non- theatrical exploitation, video devices, sound recording devices and publications".

Respondent argued that the board exploitation grant was limited in its effect due to the inclusion of the words "...on the terms and conditions set out below..." and that paragraph 9 of the agreement (which limited Licensors' adaptation work on the Programs only to the extent that it be done in a reasonable manner so as not to detract from the Programs) somehow limited the broad grant - but it does not. Paragraph 9 is only one of many terms and conditions of that agreement that clarify but do not restrict the broad grant of rights, e.g. merchandizing rights are granted but they must be compensated for.

The intention to grant basically unlimited exploitation rights is reinforced by the 1998-A which stating that it "...irrevocably extends the grant of exclusive rights..." from the 1991-LA in that "Such exclusive rights shall include all rights in all media now existing or hereafter invented, including but not limited to, theatrical, non-theatrical, television, video, merchandising, soundtrack and publications rights excluding only the merchandising rights in Japan...." (Emphasis added). Tellingly, that exclusion is the only restriction on the rights granted. Therefore,

Claimant, for example, would have the right to exploit a live action motion picture by theatrical or other of the ways so listed.

Assignment Rights

Additionally, the 1991-LA gave Licensee *"…the right to assign, license, delegate, lend or otherwise transfer its rights, options or privileges granted hereunder in whole or in part to any third party, but in no case the Licensee shall transfer its obligations to the Licensor to any third party"*. It also provided that even if the agreement were to be terminated *"…pre-existing licenses entered into by Licensee shall not be disturbed in any way"*. The *Gardner* case cited and relied on by Respondent is inapplicable in a situation as the present where the contract expressly provides for an exclusive right of assignment.

Sequel Rights Granted, Taken Away and Reinstated

The 1998-A relinquished Claimant's rights to make sequels to the Programs which was granted to it in the 1991-A. This was to eliminate the possibility that Big West could claim the Respondent was infringing on its rights during the pendency of the dispute.

In the 2002-A Claimant's sequel rights were restored in *Mospeada* and *The Southern Cross*.

The 2003-A then restored, i.e. granted, the right to make derivative works of *Macross*. It was signed by Koki Narushima who was then, as stated above, the President and CEO of Respondent and thus had actual and apparent authority to bind his company. Respondent asserts "suspicions" about the coming into existence of this agreement but suspicions alone are not enough to discredit

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 10 of 21

same and the elements upon which a claim of fraud would rest are unproven. The signature was not forged and was signed by both parties in or around June 2006 as evidenced by Claimant's transmittal thereof to its counsel Leonard B. Rosman who was involved, at that time, in various related matters for the company. Additionally, additional evidence of its authenticity comes from the subsequent 2008-A which listed that document in its preamble recital of all prior Operative Agreements and which was vetted, as testimony confirmed, by Respondent's stringent internal review procedures prior to approval and signature. This amendment was negotiated between 2005 and 2006 but was backdated to 2003 to coincide with the approximate date of the trial court decision in the Big West litigation.

Thus, pursuant to the 2003-A Respondent granted to Claimant all its remaining rights in *Macross*, including derivative and sequel rights but naturally excluding any right to create derivative works using the 41 original character from *Macross* program which now belonged to Big West. The seeming inexactitude language regarding the 41 original characters may have been in artfully drawn but was intended to track the decision in the Big West litigation so that Licensor was giving up everything *it* owned.

The Arbitrator has been mindful throughout of the parole evidence rule that doesn't permit extrinsic evidence when there is clarity in contractual terms which is largely the case in this matter.

Exploitation of Digital Media (such as internet streaming or video on demand) of *Robotech* were also expressly permitted under the Operative Agreements. The 1991-LA provided that the License fees were "...*for TV and other visual rights*". *(Emphasis added)* and in the 1998-A exploitation thereof was authorized "...*in all*

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 11 of 21

*media now existing or hereafter invented…"* which is industry standard language for granting rights in new media that may not have existed at the time of initial agreement.

<u>Sublicense of Clips and Music</u>

The 1991-LA gave Claimant the rights to exploit the Programs,  *"…and any and all <u>music, sound track and effects</u>, animation, artwork, <u>and all other components thereof</u> using any methods or devices of exploitation…."* (Emphasis added). In the 1998-A Claimant's exclusive rights were stated to *"… include all rights in all media <u>now existing or hereafter invented</u>…"* (Emphasis added).

The express language of both of these provision established Claimant's right to exploit the Programs by licensing clips and music therefrom.

<u>Home Video Rights not part of Merchandising</u>

The Original Agreements and the Operative Agreements (quoted hereinabove) granted the right to exploit *Robotech* in merchandising, video and otherwise. Specific royalty payments were set forth in detail for such exploitation by way of merchandising; none were delineated for exploitation by way of video nor for that matter for exploitation by way of television or the many other possible means of exploitation that were authorized. The reason for that is that no separate payment was negotiated or agreed for rights granted and/or to be exploited other than for merchandising. The license fee was to cover, for the specific term, the right to produce and exploit the Programs in new works for all purposes except that additional consideration was to be paid for merchandising. That video or home video rights are terms of art understood in the motion picture industry to be separate and distinct from merchandising rights such as toy, games, etc. is axiomatic. The parties' various agreements do not change that meaning. The

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 12 of 21

1991-LA provided that the License fees were "…*for TV <u>and other visual rights</u>*".

*(Emphasis added)* and in the 1998-A exploitation thereof was authorized "…*in all media now existing or hereafter invented…*"

Other than an almost thirty year old fax from Frank Agrama equating the two (video and merchandizing) the parties' subsequent relationship reflects otherwise and while Licensee produced testimony substantiating its view the Licensor produced no witnesses adverse to this understanding. Throughout the parties' history they negotiated specific and separate payments for video and merchandizing when they saw fit to do so and were clearly capable of distinguishing the two. Here they did not do so. Until this Arbitration the Respondent never objected to not receiving home video royalties.

Thus, the parties' conduct and specific contractual language require the conclusion that under the Operative Agreements the license fee was a flat fee that covered all television and all other visual rights including home video carving out only a separate calculation and payment for merchandizing.


<u>Legal Fee Expense Offset Against Royalties of $541,362</u>

Due to Big West litigation, Respondent asked Claimant to enforce and protect the *Macross* trademarks outside of Japan which included analyzing and tracking said litigation, traveling to Japan and providing documents and advice in support thereof. The parties agreed that Claimant would deduct such costs, including legal fees, from future royalties that might become due to Respondent. This offset while not reduced to writing was orally agreed to and confirmed by the parties' conduct over many years culminating in a documentation thereof in 2009 by Claimant after a meeting in Los Angeles between Frank Agrama and Koki Narushima. As further corroboration of Respondent's knowledge of these costs and the recoupment arrangement, Respondent attempted to recoup these legal

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 13 of 21

fees from Big West and sought a declaration from Claimant assisting them in this regard.

### Copyrights and Trademarks

The 1998-A gave Claimant permanent, exclusive copyrights and trademarks in all materials it created or utilized from the Programs: "...all trademarks, copyrights and other rights in any materials created or utilized by Claimant in connection with the exercise of its rights under the 1991-LA, including but not limited to the name "*Robotech*", shall be exclusively owned and controlled through the universe in perpetuity by Claimant".

a.   Copyright

Claimant is accused of infringing Respondent's copyrights in the Programs. The Operative Agreements and Claimant's actions based thereon do not support such claim because the Claimant as an exclusive licensee and joint copyright owner of the works in question cannot, as a matter of law, infringe same. In this case an exclusive licensee cannot be liable for infringing the rights of copyright conveyed to it nor can a co-owner be liable to the other for infringement thereof. Additionally, pursuant to the agreements and its various actions over the many years, Claimant's registering of copyrights was in furtherance of its rights.

b.   Trademarks

Beginning in summer 1999 Claimant began to register trademarks relating to *Robotech* solely in its own name which was permitted by the 1998-Λ. Doing so was affirmed often by Respondent over the years.

Also, Respondent's claim for cancellation of the *Macross* and other trademarks (of which it was aware since 2005) fails because such marks are presumptively valid after five years of continuous use and no fraud has been proven related to their use and registration which might otherwise have avoided this bar.

Statute of Limitations

Claims made by Respondent herein may be barred by Statute of Limitations

(herein "SOL") considerations or denied for other substantive reasons, as

discussed herein, or for both. As an example, if claims were asserted relating to

the deal with Columbia pictures they would not be time barred having occurred in

2016 but would nevertheless be denied based on the Arbitrator's determination

that production and exploitation of "live action" right were authorized. Also, the

legal fee offset would be both time barred and denied for substantive reasons.

Here SOL considerations alone are a bar to most of the audit and/or other claims

and causes of action proffered by Respondent. A cause of action for breach of

contract accrues at the time of breach, which then starts running of the

limitations period. Claims based on a written contract may be sought only within

four years from their occurrence. Such period may be extended or tolled only in

limited cases where one could not with reasonable diligence have discovered its

claim earlier.  Here Respondent had actual and/or constructive knowledge to

establish its claims earlier (e.g. knew of the release of Shadow Chronicles in 2006

and the Warner Bros. live action deal in 2009) and failed to do so (until filing

demand for arbitration in July 2016) and failed to audit and/or request royalty

statements in a timely manner. All but $988,251 of Respondent's claimed

damages are time barred having been incurred more than four years before

Respondent first sued as they had knowledge of the facts necessary to make

their claims earlier.

While not a SOL statutory issue it should be noted that in the 2002-A the

Respondent acknowledged that "….the Licensee has fulfilled its obligations to date

under the 1991-LA and the 1998-A" thereby waiving claims prior thereto.

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 15 of 21

Audit

The 1991-LA entitled the Respondent to make an audit each twelve months. Yet
it only chose to exercise that right, for the very first time in over three decades of
the relationship, in 2015-6. Said agreement did not require Claimant to provide
participation statements but Respondent, until just prior to this Arbitration, never
even asked for them. It should be noted that even if Claimant had contractually
agreed to provide royalty statements such agreement, as is customary in the
industry, would have established a cut-off date for objections to same of one year
or eighteen months from submission wherein claims made thereafter would be
barred. Respondent should not be in a better position than if the Operative
Agreements made provision for royalty statements. It should be noted that
Licensee, without request, regularly sent detailed information to Licensor about
its accrued royalties, including sending a formal royalty statement in October
2005, yet despite normal follow-up Licensor never chose to audit or sue, until
now. By permitting the audit the Claimant did not waive any of its defenses
including its right to assert the statute of limitations as it reserved all defenses
when it consented to the audit. Furthermore, simply permitting an audit did not
revive claims that were time barred before the audit began.


Certain Audit Claims

Three of the various audit claims are adjudicated as follows: (a) Sub-licensee
Toynami royalties were properly accounted for over the years. The $1.2 million
claimed in the audit were not for royalties owed but rather for loan repayments
and/or investments by Licensee in Toynami's start-up, (b) As to Robotech.com
receipts a full royalty was paid once to Licensor on the merchandize and a second
royalty, on the same merchandize, would not be warranted when and because
they were resold and (c) As exclusive holder of the license in and to the

Programs, having paid a contractual fee for the rights granted, Licensee is

entitled to sue for infringement of its own rights and has no obligation to share

with Licensor any recovery therefrom.


<u>Wiltshire Trading Co.</u>

This was an investment in Claimant's company and infrastructure and for

production costs for Shadow Chronicles in exchange for a participation of

Claimant's share of revenue therefrom. This was not, as claimed by Respondent,

revenue earned from exploitation of the Shadow Chronicles as to which

Respondent might otherwise have been entitled to share.


<u>Claims justified after consideration of Audit Claims and SOL & other defenses</u>

In light of the foregoing reasons and conclusions of the Arbitrator above, all of

the audit claims are denied except as follows: Respondent is entitled to an

accounting for the sum of $42,543 as set forth in Claimant's expert's Exhibit

C410 #1 subject to whatever offsets may remain in connection with Big West

incurred legal fees.


<u>Derivative Production Rights After Expiration Of The Term on March 14, 2021</u>

The 1998-A provided that: "*Notwithstanding anything to the contrary in the*

*1991-LA, all trademarks, copyrights and other rights in any materials created or*

*utilized by Harmony Gold in connection with the exercise of its rights under the*

*1991-A, including, but not limited to, the right to the name "ROBOTECH", shall be*

*exclusively owned and controlled throughout the universe in perpetuity by*

*Harmony Gold*".

Among other things, Claimant believes that the above quoted language grants

them the right to continue to produce and/or exploit derivative works of the

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 17 of 21

Programs in perpetuity. Among other arguments, Claimant relies largely on the belief that "utilized" includes the Programs but that is contrary to the interpretation established by Respondent's proofs that same referred to third party property not the Programs.

Arbitrator finds that Claimant's license in the Programs expires on March 14, 2021 as does their right to produce and/or exploit works based on any of the Programs. From the very beginning of the parties' relationship, they were dealing with finite terms that required additional consideration to be given for extension of the rights granted. To allow use of the Programs beyond the term without payment of consideration for renewal thereof would be totally inconsistent with the parties' course of dealing over these many years. The 2002-A extended the term of license on the Programs (all three since the reference therein is to paragraph four of the 1998-A which related to all of the Programs) until March 14, 2021. If the parties, in accordance with the Operative Agreements, do not reach an agreement to extend then Claimant would no longer have the right thereafter to produce and/or exploit any product containing the Programs or any part thereof.

This conclusion is additionally supported by the *Steward v Abend* case, cited and relied on by Respondent, and the 1976 Copyright Act in that derivative works may only be exploited so long as its license to use the Programs incorporated therein has not ended.

The Arbitrator has reviewed and/or considered the pleadings, witness testimony; exhibit books, documentary evidence, post-Hearing briefs and the numerous arguments presented by the parties, their legal theories and reliance on statutory and case law, including those not specifically addressed above, all of which have

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 18 of 21

been carefully considered in reaching this decision and now makes the following

determinations:

## AWARD

1.  Declaratory and other Relief Granted in favor of Claimant

a.  To the date hereof Claimant has not materially breached any agreements with

Respondent related to the Programs nor infringed any of Respondent's rights

therein including but not limited to infringing on Respondent's copyrights or

fraudulently registering *Macross* trademarks;

b.  The Original Agreements and Operative Agreements grant Claimant the right

to make derivative works of the Programs and *Robotech*, including live action

motion picture adaptations, and Claimant has not produced any unlicensed

works;

c.  The 2003-A is valid and binding on Respondent, and Claimant has been

granted therein all of Respondent's copyright rights in *Macross,* except for the

visual depiction of the original 41 animated graphic characters from the

underlying Program, pursuant thereto;

d.  The Operative Agreements grant Claimant the express right to sublicense its

rights as it chooses, and Claimant has neither breached said agreements nor

infringed on Respondent's rights by entering into such sublicenses;

e.  The Operative Agreements grant Claimant the express right to exploit the

Programs and any derivative works in all media, including digital, and

Claimant has not breached said agreement nor infringed on Respondent's

rights by exploiting the Programs and related derivative works in digital

media;

f.  The Operative Agreements grant Claimant the right to exploit the Programs

and any derivative works through sublicensing of music and clips, and

Case 2:17-cv-00327-TSZ Document 48-3 Filed 11/13/17 Page 23 of 27
Case 2:17-cv-06034-PA-MRW Document 16 Filed 08/29/17 Page 22 of 26 Page ID #:142

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 19 of 21

Claimant has neither breached the agreement nor infringed on Respondent's rights by exploiting the Programs and related derivative works through such sublicenses;

g.  Claimant owes no royalties for home video exploitation pursuant to the 1991-LA as same are part of the flat license fee for visual rights;

h.  <mark>Claimant had and has the right to offset against royalties otherwise owed to Respondent the sum of $541,362 incurred by Claimant in connection with the Big West litigation, until recouped;</mark>

i.  To the date of the last royalty statement or audited date, Claimant has fully accounted for all royalties owed to Respondent except for the amount of $42,543 which Claimant is to account for and/or to pay to Respondent forthwith subject to any continuing proper offsets.

j.  Respondent's audit and other claims, as are identified in the body hereof and in Respondent's request for relief, are time barred as they arise out of claims more than four years old for its breach of contract claims, and more than three years old for its copyright claims;

k.  As of this date, Respondent is not entitled to terminate the Operative Agreements or otherwise curtail Claimant's rights thereunder.

l.  Claimant owns in perpetuity the title Robotech and the produced *Robotech* programs with exploitation thereof subject to Respondent's rights on termination of the Operative Agreements.


2.  Relief Granted in favor of Respondent

a.  Claimant's right to use the Programs for production and/or exploitation of new works expires on March 14, 2021 along with any extant sublicenses as all rights to the Programs revert back to Respondent at that time.

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 20 of 21

    b.  Upon expiration of the term of the Operative Agreements, the Claimant no longer has any right to use or exploit derivative works produced during the term, which contain portions of the Programs, as rights to the Programs revert back to Respondent at that time.

    c.  Claimant has no permanent, exclusive, and irrevocable copyright and trademark rights in the Programs as same shall belong to Respondent on expiration of the term in 2021;

    d.  Upon expiration of the term, Respondent shall have the right and option to disaffirm/cancel any existing licenses, assignments and/or other agreements extending beyond the term as may have been entered into by Claimant with others granting any rights in and to the Programs;

    e.  Claimant is to pay to Respondent the sum of $42,543 as a result of the audit subject to any remaining proper offset rights due to the Big West legal fee expenditure.

    3.  <u>The award of all "costs"</u> of the arbitration is to be determined in the sole discretion of the Arbitrator in accordance with paragraph 14 of the Rules as the Operative Agreements do not provide any guidance regarding same. At the close of the Hearing on May 19, 2017 the Arbitrator advised the parties in writing that: "Legal fees are to be reasonable and <u>directly related to this arbitration</u> but need not be the same for each firm as, for example, pay scales, number of attorneys working on the matter, etc., may be different". The Arbitrator determines that it is appropriate to consider only costs directly relating this arbitration and not the prior arbitration and mediation on this matter. Thus, the Arbitrator finds that Claimant, as the predominantly prevailing party, is entitled to recover and Respondent owes Claimant such costs as adjusted by the Arbitrator in the

Re: Harmony Gold, USA, Inc., v Tatsunoko Production Co., Ltd.
Page 21 of 21

total amount of $848,708 which consists of Claimant's legal fees, allowed by Arbitrator as being reasonable, in the amount of $711,930 and Claimant's costs of $136,778 which include its share of both IFTA filing fees of $1,100 and Arbitrator fees of $25,612.

4. This Award is in full resolution and settlement of all claims and counter claims submitted to this Arbitration. All claims and counter claims not expressly granted herein are hereby denied.

5. This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Dated June 27, 2017
Los Angeles, California

Jack E. Freedman        Sole Arbitrator

# Freedman Communications, Inc.
## fso JACK E. FREEDMAN, ESQ.
**1093 Broxton Ave., Suite 228, Los Angeles, CA 90024**
JackFreedmanEsq@Gmail.com

### ARBITRATOR final INVOICE –  June 26, 2017

### RE:          IFTA  Arbitration #16-75

# Harmony Gold, USA, Inc. v. Tatsunoko Production Co., Ltd.

| DATE | SERVICES | HOURS |
|---|---|---|
| **2017** | | |
| 4.25 | EM: JSB submitting Declaration, Request 4 days for Hearing, Setting Hearing Location; A response | ¼ |
| | Review Narushima Declaration | ¼ |
| 4.27 | Review Light papers objecting to Narushima Declaration Em from JSB and Arbitrator response | 1 ¾ |
| 5.3 | Review Pleadings, Declarations, Exhibits re: Narushima Declaration Issue Ruling | 3 ½ |
| 5.4 | Review Claimant Opening Trial Brief, Exhibits & Authorities | 2 |
| 5.5 | Review Respondent Pre-Hearing Statement, Exhibits, Authorities, Declarations (4) | 2 |
| 5.4-8 | Expert substitution; type of award | n/c |
| 5-10-15 | Review Claimant Responding Brief, exhibits, authorities, final witnesses | 2 |
| 5.10-15 | Review Respondent Rebuttal to Claimant's Pre-Hearing Statement, Supplemental Declarations (2), final Witness List | 2 |
| 5.10-11 | Discussion of volume of exhibits/witnesses causing hearings to exceed 4 days Counsel response on above and procedural matters | ¼ |
| 5.10-11 | Award per Rule 12.2 and court reported permitted | n/c |
| 5.10-15 | Review Claimant Exhibit books | 5 |
| 5.10-15 | Review Respondent Exhibit books | 5 |

| 5.12 | Review Claimant 4 additional exhibits | ¼ |
|---|---|---|
| 5.15 | Review 9 additional Claimant exhibits | ½ |
| 5.16 | Hearing Day 1    9-6 (all include 30 minute rt travel time (Rule 14.1.2) | 9 ½ |
| 5.17 | Hearing Day 2   9:60 | 10 |
| 5.18 | Hearing Day 3   9-6:30 | 10 |
| 5.19 | Hearing Day 4   9-7:15 | 10 ¾ |
| 5.19 | Closing letter from Arbitrator re: post hearing issues. | ¼ |
| | | |
| 6.1 | Counsel request to postpone interest calculation | n/c |
| 6.5-6 | Receipt of closing docs/questions | n/c |
| 6.7 | EM re: adjustment of costs submitted; A response re: reporter, meals | ¼ |
| 6.7-23 | Review C & R Post-Hearing Briefs/Authorities, Legal fee declarations | 50 |
| | Review transcripts, exhibits, notes. | |
| 6.14 | A questions to Counsel re: transcripts | n/c |
| 6.16-24 | Prepare Award | 15 |
| | | |
| 6.27 | Submit Award to IFTA for transmittal to parties | n/c |

130 ½    Total hours at $350 per hour = $45,675   less deposits of $43,000 = $2,675 unpaid/due = $1,337 from each party.

**Payments to be made to "Freedman Communications, Inc."**
**Federal Tax I.D. # 9503993694 and sent to:**
          **Freedman Communications, Inc.**
          **Attention: Jack E. Freedman**
          **1093 Broxton Ave., Suite 228,**
          **Los Angeles, CA 90024-2831**