THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HARMONY GOLD U.S.A., INC.,

Plaintiff,

v.

HAREBRAINED SCHEMES LLC,
HAREBRAINED HOLDINGS, INC.,
JORDAN WEISMAN, PIRANHA GAMES
INC., INMEDIARES PRODUCTIONS,
LLC, and DOES 1–10

Defendants.

CASE NO.  2:17-cv-00327-TSZ

**DECLARATION OF JESSICA
STEBBINS BINA IN SUPPORT OF
HARMONY GOLD, U.S.A., INC.'S
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

**REDACTED**

**NOTE ON MOTION CALENDAR:
DECEMBER 15, 2017**

**ORAL ARGUMENT REQUESTED**

I, Jessica Stebbins Bina, declare as follows:

1.      I am an attorney at Latham & Watkins LLP, attorneys for plaintiff Harmony Gold

U.S.A., Inc. ("Harmony Gold"), over eighteen years of age, and am competent to testify herein.

I make this declaration in support of Harmony Gold's opposition to defendants' motion for

summary judgment.  The facts set forth below are based on my personal knowledge, including

DECL. OF STEBBINS BINA IN SUPPORT OF
HARMONY GOLD'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT (Case No. 2:17-cv-
00327-TSZ) **-** 1

knowledge gained through my review of and familiarity with files and documents in this matter. If called as a witness, I could and would competently and truthfully testify to these matters.

## Japanese Court Decisions

2.       Attached hereto as **Exhibit A** is a true and correct copy of a certified English-language translation and original Japanese-language excerpt of a Japanese district court decision from the action entitled *Studio Nue Co. Ltd. and Big West, Inc. v. Tatsunoko Production Co., Ltd.*, 2001 (Wa) No. 1844 (Tokyo District Court, Civil Division 29).  Another translation of this decision was attached as Exhibit 1 to the Declaration of Ryan B. Meyer (Dkt. 48-1).  I reviewed this excerpt as translated by defendants' translator, and questioned whether that translation was accurate as it did not match informal translations Harmony Gold had of the same excerpt, nor was it consistent with (a) the October 1, 1982 Memorandum of Agreement (the "1982 Big West Agreement") between Tatsunoko Production Co., Ltd. ("Tatsunoko"), K.K. Big West ("Big West"), and K.K. Studio Nue ("Studio Nue") attached as Exhibit A to the declaration of Christy Duran filed concurrently herewith; or (b) the January 20, 2003 Japanese court decision among the same parties (the "2003 Japanese Decision") attached Exhibit B below.  Accordingly, I engaged a certified translator to have this excerpt re-translated.  The translation attached as Exhibit A is consistent with the 1982 Big West Agreement and the 2003 Japanese Decision, but differs from the language presented in Exhibit 1 to Mr. Meyer's declaration.  For ease of reference, substantive differences are excerpted below with emphasis added, and the second page of Exhibit A outlines the excerpt from Dkt. 48-1 that has been re-translated:

Exhibit A

The Defendant sued Plaintiff Big West prior to the broadcast of this television animation, claiming that production costs were incurred beyond the initial plan, and that the aforementioned production costs to be paid by Mainichi Broadcasting would be insufficient. For this reason, the Plaintiffs and the Defendant created a memorandum (B

DECL. OF STEBBINS BINA IN SUPPORT OF
HARMONY GOLD'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT (Case No. 2:17-cv-
00327-TSZ) **-** 2

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

3) on October 1, 1982, which gave the Defendant part of the profit from the commercialized business **as well as overseas broadcast distribution rights and [overseas] merchandising rights**, in order to apply these to the shortfall in the production costs.

Based on the above memorandum, it was agreed that the contact points to exercise the rights would be Plaintiff Big West for merchandising of characters etc. and selling programs for reruns in Japan, **Defendant for publications aimed at 6th graders and below, music, overseas distribution rights and general merchandising rights**, and Plaintiff Studio Nue for publications aimed at junior-high schoolers and above; and for each of the subjects, the ratio for allocating profits among Plaintiffs and Defendant was decided (Mainichi Broadcasting was also allocated profits from domestic merchandising rights, and **Defendant received all profits from exercising, etc. merchandising rights overseas**).

Meyer Decl., Ex. 1 (Dkt. 48-1)

However, before broadcast of the Television Animation Program began, the Defendant complained to Plaintiff BigWest that production costs were greater than originally estimated and that the broadcast fee amount paid via Mainichi Broadcast was insufficient. In order to cover the shortcoming in production costs, the Plaintiffs and the Defendant on October 1, 1982 concluded a memorandum of understanding (Exhibit B3) in which **some profits from commercialization and overseas program sales rights and merchandising rights** for the Television Animation Program would be given to the Plaintiff.  In other words, according to the memorandum of understanding.

DECL. OF STEBBINS BINA IN SUPPORT OF
HARMONY GOLD'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT (Case No. 2:17-cv-
00327-TSZ) **-** 3

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

In the memorandum, Plaintiff BigWest would exercise rights as gatekeeper of commercial rights to the characters etc. and program sales for domestic re-broadcast, the **Defendant** would exercise rights as gatekeeper to **overseas program sales rights** and of **general commercial rights to publications and music for elementary students** up to sixth grade, and Plaintiff Studio Nue would exercise rights as gatekeeper of publications for middle school students on up; and the ratio for distribution of profits for each was determined between the Plaintiffs and the Defendant (profits for domestic commercialization rights were also distributed to Mainichi Broadcasting and **all profits from the exercise of commercialization rights overseas went to the Defendant**).

3.      Attached hereto as **Exhibit B** is a true and correct copy of a certified English-language translation and original Japanese-language court decision in *The Super Dimension Fortress Macross Case*, Tokyo District Court, 29th Civil Division, 2001 (Wa) Number 6447, dated January 20, 2003 (the "2003 Japanese Decision"), as reprinted in D1-Law.com, a database of Japanese court decisions similar to Westlaw and LexisNexis.  Portions of the translation have been highlighted.

**The Tatsunoko/Harmony Gold Arbitration**

4.      In May 2017, I represented Harmony Gold in a private arbitration against Tatsunoko.  None of the defendants in the current action were parties to the arbitration.  The primary dispute in the arbitration involved Harmony Gold's right to make live-action derivative motion pictures.  The parties also disputed whether Tatsunoko had received full royalty payments under the 1991 Agreement.  Tatsunoko did not challenge Harmony Gold's exclusive contractual license to display, distribute, reproduce, or merchandise any of the characters contained in "Macross."

5.      Neither Harmony Gold nor Tatsunoko agreed that the Arbitration Award would have any preclusive effect in favor of third parties.

DECL. OF STEBBINS BINA IN SUPPORT OF
HARMONY GOLD'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT (Case No. 2:17-cv-
00327-TSZ) **-** 4

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

6.      The arbitration was confidential, but Harmony Gold thereafter sought confirmation of the award in the Central District of California, as Tatsunoko stated it would only pay the awarded attorneys' fees if the award were judicially confirmed.  Attached hereto as **Exhibit C** is a true and correct copy of the August 14, 2017 Petition to Confirm Arbitration Award and for Entry of Judgment submitted to a Central District of California court sitting in diversity.

7.      During the arbitration, the arbitrator ███████████████████████ ████████████████████████████████████████████████████████ ██████████.  I was given an opportunity to review these documents, subject to the conditions that I keep them confidential and use them only in connection with the arbitration and for no other purpose.  Information contained in these documents supports Harmony Gold's claim to standing in this case.  Accordingly, Harmony Gold intends to seek these documents, as well as related documents and testimony ████████████████████, through discovery in the current action and is in the process of preparing letters rogatory seeking the same.

### Discovery and Communications with Defendants' Counsel

8.      Very limited discovery has been conducted in the current action to date.  There has been only a single round of written discovery and the exchange of a few hundred pages of documents, and no depositions.  It is my understanding that, prior to my entry into the case as counsel for Harmony Gold in late October 2017, the parties had engaged in settlement discussions which included, for the past several months, an informal stay of discovery.  It is my further understanding that while the parties have agreed to further productions, those productions have not yet been made by any party.  No depositions have been taken to date in this case by any party.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DECL. OF STEBBINS BINA IN SUPPORT OF
HARMONY GOLD'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT (Case No. 2:17-cv-
00327-TSZ) **-** 5

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

Signed this 11th day of December, 2017, at Los Angeles, California.


By: *s/ Jessica Stebbins Bina*
Jessica Stebbins Bina

DECL. OF STEBBINS BINA IN SUPPORT OF
HARMONY GOLD'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT (Case No. 2:17-cv-
00327-TSZ) **-** 6

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 11, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants.

DATED this 11th day of December, 2017.

*s/ Susie Clifford*
Susie Clifford

DECL. OF STEBBINS BINA IN SUPPORT OF
HARMONY GOLD'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT (Case No. 2:17-cv-
00327-TSZ) **-** 7

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

# EXHIBIT A

(b) The Defendant sued Plaintiff Big West prior to the broadcast of this television animation, claiming that production costs were incurred beyond the initial plan, and that the aforementioned production costs to be paid by Mainichi Broadcasting would be insufficient. For this reason, the Plaintiffs and the Defendant created a memorandum (B 3) on October 1, 1982, which gave the Defendant part of the profit from the commercialized business as well as overseas broadcast distribution rights and [overseas] merchandising rights, in order to apply these to the shortfall in the production costs

Based on the above memorandum, it was agreed that the contact points to exercise the rights would be Plaintiff Big West for merchandising of characters etc. and selling programs for reruns in Japan, Defendant for publications aimed at 6th graders and below, music, overseas distribution rights and general merchandising rights, and Plaintiff Studio Nue for publications aimed at junior-high schoolers and above; and for each of the subjects, the ratio for allocating profits among Plaintiffs and Defendant was decided (Mainichi Broadcasting was also allocated profits from domestic merchandising rights, and Defendant received all profits from exercising, etc. merchandising rights overseas).

Translated Portion

　⑷　被告は，本件テレビアニメの放映開始前に，原告ビックウエストに対し，当初の予定よりも制作に費用が掛かり，毎日放送を通して支払われる前記制作費では不足する旨を訴えた。このため原告らと被告は，制作費の不足分に充当するために，昭和５７年１０月１日，商品化事業の利益の一部並びに海外における番組販売権及び商品化権を被告に与えることなどを内容とする覚書（乙３）を作成した。

　　上記覚書により，キャラクター等の商品化権及び国内再放送のための番組販売については原告ビックウエストが，小学６年生までを対象とする出版物，音楽並びに海外における番組販売権及び一般商品化権については被告が，中学生以上を対象とする出版物については原告スタジオぬえが，それぞれ窓口となって権利行使をすること，また，対象ごとに，原告らと被告の間で利益を配分する比率が定められた（国内の商品化権については毎日放送にも利益が配分され，海外における商品化権行使等による利益は，被告がすべて取得した。）。

カ　著作権等の表示

　⑺　本件テレビアニメ放映前の昭和５７年７月から同年１０月に掛けて，本件テレビアニメの内容等を紹介する記事が学習雑誌等に掲載されたが（乙１５ないし２０），これらすべてに，原告スタジオぬえと被告連名の著作権表示がある。また本文中に，原告スタジオぬえが原作を作成したこと，シリーズ構成は松崎，キャラクターデザインは美樹本がそれぞれ担当したことなどを説明したものもある。

　⑷　本件テレビアニメ放映時のオープニングクレジットでは，企画は大西，原作は原告スタジオぬえ，キャラクター・デザインは美樹本，メカニック・デザインは宮武及び河森であることなど，企画，原作，原作協力，シリーズ構成，チーフディレクター，設定監修については，原告ら及びアートランドの関係者が担当したことが表示され，プロデ

－ 14 －

32



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Wendy Poon, hereby certify that the document "Excerpt from 2002 Japanese Court Decision" is, to the best of my knowledge and belief, a true and accurate translation from Japanese into English.

_____
Wendy Poon

Sworn to before me this
December 11, 2017

_____
Signature, Notary Public

ANGELA LO
NOTARY
NO. 01LO6353549
QUALIFIED IN
NEW YORK COUNTY
COMM. EXP.
01-30-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

# EXHIBIT B

| | |
|---|---|
| Precedent ID | 28080714 |
| Summary | 1. a) The case decided that the person creatively contributing to the overall formation of a television animation program is the general director. |
| | b) With X being the person taking the initiative and having responsibility for production of the television animation program, the case decided that X is the copyright holder under the provisions of Article 29 of the Copyright Act as the maker of the cinematographic work. |
| Date of Trial | 01/20/2003 / Tokyo District Court / 29th Civil Division / judgment / 2001 (Wa) Number 6447 |
| Noted Case Name | The Super Dimension Fortress Macross Case |
| Case Name | Case Seeking Affirmation of Copyright |
| Judgment Results | Partially allowed, partially dismissed |
| Appeals, etc. | Appeal to a higher court |
| Judges | Toshiaki Iimura, Michiya Enokido, Shin Sano |
| Case History | Appeal trial 09/25/2003 / Tokyo High Court / 6th Civil Division / judgment / 2003 (Ne) Number 1107 Precedent ID: 28082741 |
| Laws Referenced | Articles 2, 15, 16, 29 of the Copyright Act |
| Publication | 1823 *Hanrei Jiho*, page 146 |
| | 1123 *Hanrei Times*, page 263 |
| | Published decision on www.courts.go.jp |
| | D1-Law.com precedent system |
| Commentary | Oka, K. *Copyrights* No. 506, pages 28 – 34. 06/2003 |
| | Yokoyama, H. *Hanrei Hyoron* No. 542 (1846 *Hanrei Jiho*) pages 187 – 194. 04/01/2004 |
| | Oka, K. *Copyrights* No. 518, pages 28 – 34. 06/2004 |
| Level of Importance | 2 |

■ 28080714
Tokyo District Court
2001 (Wa) Number 6447
01/20/2003

| | |
|---|---|
| Plaintiff | Tatsunoko Production Company |
| Counsel | Mikinori Ono |
| Same | Toshiko Kuboki |
| Same | Takayuki Shiotani |

| Same | Yuko Chiyoda |
| Defendant | Studio Nue |
| Defendant | Big West Advertising, Co., Ltd. |
| Defendants' Counsel | Katsuyoshi Shinbo |
| Same | Tadashi Kunihiro |
| Same | Yuko Gomi |
| Assistant Counsel for the Same | Koichiro Ikeda |

Holdings

1  As between the Plaintiff and the Defendants, it is affirmed that the Plaintiff is the rights holder for the copyrights for the Animation Films 1 to 36 listed in the annexure (excluding moral rights).

2  The remainder of the Plaintiff's claims are rejected.

3  The Defendants shall bear 9 / 10 of the expenses for the lawsuit, with the Plaintiff bearing the remainder.

Facts and Grounds

Number 1        Claims

1  As between the Plaintiff and the Defendants, an affirmation that the Plaintiff is the rights holder for the copyrights for the Animation Films 1 to 36 listed in the annexure (moral rights and copyrights).

2  The Defendants shall not hinder the Plaintiff from screening to the public the Animation Films 1 to 36 listed in the annexure and distributing them by means of copies.

Number 2 Overview of the Case

This is a case in which the Plaintiff seeks, as against the Defendants, an affirmation that it is the rights holder for the copyrights for the Animation Films 1 to 36 listed in the annexure (hereinafter the "Television Animation Program") and an injunction against the hindrance of the Plaintiff screening to the public the Television Animation Program.

1        Undisputed Facts

(1) The Plaintiff is an animation film studio that has produced and released animation films since the 1960s, including *Space Ace*, *Speed Racer*, *Oraa Guzura Dado*, *The Genie Family*, *The Adventures of Hutch the Honeybee* and *Gatchaman Fighter*.

The Defendant Studio Nue (hereinafter "Defendant Studio Nue") is a planning company that performs agency services such as public relations, accounting and data collection for clients including writers, illustrators and manga artists.

The Defendant Big West Advertising, Co., Ltd. (hereinafter "Defendant Big West") is a company in the business of planning and producing advertisement films, etc., for television and radio.

(2) The Plaintiff and Mainichi Broadcasting System, Inc. (hereinafter "Mainichi Broadcasting") entered into agreements (Plaintiff Exhibits 2, 3) concerning the production and broadcasting of the Television Animation Programs on 09/30/1982 (for Episodes 1 to 21) and on 03/10/1983 (for Episodes 22 to 36). These Television Animation Programs were broadcast on television from 10/03/1982 to 06/26/1983 with Mainichi Broadcasting as the key station.

The contracts for the above agreements provided that the Plaintiff is obligated to produce and deliver the Television Animation Program to Mainichi Broadcasting in accordance with the delivery schedule provided in these agreements, and that Mainichi Broadcasting could cancel these agreements and seek damages if the Plaintiff was in breach of this obligation.

2        Main Points in Dispute

(1) Did the Plaintiff obtain moral rights and copyrights to the Television Animation Program under the provisions of Article 15(1) of the Copyright Act (hereinafter the "Copyright Act")?

(2) Did the Plaintiff obtain copyrights to the Television Animation Program under Article 29(1) of the Copyright Act?

Number 3        Assertions of the Involved Parties concerning the Points in Dispute

(Assertions of the Plaintiff)

1        Primary Assertions (obtaining moral rights and copyrights under Article 15(1) of the Copyright Act)

(1) Legal Basis

Article 15(1) of the Copyright Act stipulates "… a work (except a work of computer programming) that the employee of a corporation or other employer … makes in the course of duty at the initiative of the corporation, etc., and which the corporation, etc., makes public as a work of its own authorship, the author is the corporation, etc."

(2) Creators
For the Television Animation Programs, "those creatively contributing to the overall formation of the creative works in the films" are the producer, P, and the onsite production producer, Q. These people produced the Television Animation Program in the course of their employment working for the Plaintiff.

Also, even if the Defendant Big West, the Defendant Studio Nue and the staff of Artland, which is not involved in the litigation, participated in the creation of the Television Animation Program, none of them managed the "(contribution) to the overall formation of the creative works in the films."

(3) Release Names
Concerning the Television Animation Program, the Plaintiff had scheduled releases as works of the Plaintiff's own ownership, and in fact, they were released as works of the Plaintiff's own ownership. Each episode of the Television Animation Program stated in the credits, "Produced by Mainichi Broadcasting, Tatsunoko Production, Anime Friend." These credits did not mention the Defendants, and the Defendants have not raised any objections to the crediting of these producers.

(4) Conclusion
Accordingly, the Plaintiff has obtained moral rights and copyrights to the Television Animation Program under the provisions of Article 15(1) of the Copyright Act.

2        Secondary Assertions (obtaining copyrights under Article 29(1) of the Copyright Act)

(1) Legal Basis
Article 29(1) of the Copyright Act stipulates, "If the author of a cinematographic work … has promised the producer of the cinematographic work that the author will participate in its making, the copyright to that cinematographic work belongs to the producer of the cinematographic work," and Article 2(1)(x) stipulates, "'producer of a cinematographic work' means the person that takes the initiative and has the responsibility for a cinematographic work."

(2) Producer of Cinematographic Works

As stated below, the Plaintiff is the producer of cinematographic works for the Television Animation Program. That is to say, the production of the Television Animation Program was performed based on the decisions of the Plaintiff pursuant to the agreements with Mainichi Broadcasting (Plaintiff Exhibits 2, 3), these agreements were established on the premise of Mainichi Broadcasting obtaining exclusive rights in Japan to broadcast the Television Animation Programs produced by the Plaintiff, and the agreements clearly state that "disposition of all rights including copyrights concerning … production of the Films" shall be conducted entirely under the responsibility and expense of the Plaintiff (Article 8). Further, excluding expenses paid from Mainichi Broadcasting (5,500,000 yen / episode, but such payment to be made after broadcasting of the Television Animation Program), all expenses for production of the Television Animation Program were borne by the Plaintiff, with no expenses borne by the Defendants whatsoever. The Plaintiff hired a total of at least 200 production staff to produce the Television Animation Program and paid the entirety of their compensation. As such, the Plaintiff ultimately bore the economic burden required to produce the Television Animation Program.

As stated above, the Plaintiff is the producer of the cinematographic works having the initiative and responsibility for the production of the Television Animation Program.

(3) Promise of Participation

Even if the creators of the Television Animation Program had not been the above P and Q, but another party named R, for example, because such party would have promised the Plaintiff, who is the producer of the cinematographic work, to participate in the production of such, the Plaintiff would still have been the rights holder of the copyrights concerning the Television Animation Program.

Also, because the Plaintiff and the Defendants had entered into a memorandum (Plaintiff Exhibit 4) concerning the distribution of rights and benefits arising from the copyrights premised upon the Plaintiff owning the copyrights for the Television Animation Program, the Defendants were aware from the beginning that the Plaintiff is the owner of such copyrights.

(4) Conclusion

Accordingly, the Plaintiff has obtained the copyrights to the Television Animation Programs under the provisions of Article 29(1) of the Copyright Act.

(Counterargument of the Defendants)

1    To the Primary Assertions (obtaining moral rights and copyrights under Article 15(1) of the Copyright Act)

(1) Admit or Deny

The Defendants deny the assertions of the Plaintiff.

(2) Creators

For the Television Animation Program, "those creatively contributing to the overall formation of the creative works in the films" are R of Artland and others employed in the business of the Defendants. As demonstrated below, R and others created the Television Animation Program in the course of their employment working for the Defendants.

In the Television Animation Program, matters such as the proposed story structure, image of the work, and the original designs of the main characters were completed before the Plaintiff participated in production of the animation programs.

The Defendants had initially planned to have Artland perform the production work for the animation programs, but it would have been difficult for them to do this alone because they had no experience in serial program broadcasting. They therefore merely asked the Plaintiff's participation to perform the task of turning it into animation programs.

Also, after the Plaintiff participated in the production task of the Television Animation Program, it was R who directed the Television Animation Program as the general director, and it was mostly S and others, who were employees of Defendant Studio Nue, that produced the model sheets for the animation programs. They did not receive any instructions from the Plaintiff or Anime Friend, a subsidiary of the Plaintiff.

(2) Release Names
The Plaintiff did not plan to release the Television Animation Program as works of its own ownership. The mark of the copyright rights holder for Television Animation Program states "Big Wes" for Defendant Big West (Defendant Exhibits 1, 2, 8, 10).

(3) Conclusion
As stated above, the Defendants have obtained moral rights and copyrights to the Television Animation Program.

2      To the Secondary Assertions (obtaining copyrights under Article 29(1) of the Copyright Act)

(1) Admit or Deny
The Defendants deny the assertions of the Plaintiff.

(2) Producer of Cinematographic Works
As stated below, Defendant Big West and Defendant Studio Nue produced the Television Animation Program under joint initiative and responsibility.

That is to say, the planning of the Television Animation Program started when O, the former President of Defendant Big West who knew of an idea that the Defendant Studio Nue had, attempted to complete the idea, and the Defendants decided such matters as sponsors, broadcasters and titles. Accordingly, it was the Defendants who took the "initiative" for the production of the Television Animation Program.

Also, Defendant Big West received advertising fees from sponsors, paid a monthly total of 48,000,000 yen (production expenses: 24,050,000 yen, broadcast fees: 22,445,000 and micro expenses: 1,505,000 yen; excluding 5,242,600 yen in Defendant Big West's commission) in broadcasting fees (Defendant Exhibit 5) to Mainichi Broadcasting during the broadcast period of the Television Animation Programs, and deposited 50,000,000 yen as a guarantee for these payments with Mainichi Broadcasting (Defendant Exhibit 6, Article 2). While Mainichi Broadcasting paid 5,500,000 yen in production expenses (Plaintiff Exhibits 2, 3) for each episode to the Plaintiff, this was also paid out from the above 48,000,000 yen paid by Defendant Big West.

As such, Defendant Big West bore the responsibility to pay the monthly total of 48,000,000 yen in broadcasting fees to Mainichi Broadcasting as well as the risk if money was not received from sponsors. In terms of relationships with sponsors, it was Defendant Big West that was responsible for completion and broadcast of the Television Animation Program.

(3) Promise of Participation

As stated above, although R and others of Artland were "those creatively contributing to the overall formation of the creative works in the films" concerning the Television Animation Programs, they did not promise the Plaintiff that they would participate in the production thereof.

Also, because the indication of the copyright rights holder for the Television Animation Program states "Big West," under Article 14 of the Act it should be presumed that Defendant Big West is the rights holder of the copyrights.

Number 3    Decision of the Court

1    Concerning the Primary Assertions

To begin with, regarding the primary assertions we will focus our consideration on who contributed creatively to the overall formation of the Television Animation Programs.

(1) Factual Findings

If we synthesize the above undisputed facts with the evidence (Plaintiff Exhibits 1 to 4, 7 to 9, 12 and 18, Defendant Exhibits 1 to 10, 13 – 16, 18, 19 and 21 to 25, and Plaintiff Exhibits *ken* 1 to 3, with sub-number indications omitted) and the overall purport of the arguments, the below facts can be recognized. There is not sufficient evidence to overturn them.

a. History of the Planning

Around 1980, Defendant Studio Nue planned a new animation work in which civilians lived in a giant spaceship and fought a war with an army of giant space people inside and outside the spaceship and that was characterized by use of unconventional transformable mecha including fighter craft that played a main role in the battles; and the representative T as well as the employees S, U and others formed a team and began production (the planning is hereinafter referred to as "the Project"). Also, S focused on drawing pictures of human characters created by S's friend V (hereinafter collectively referred to with S and U as "S and Others"), and had V manage the Project while V was still belonging to Artland, which was in a cooperative relationship with Defendant Studio Nue.

Defendant Studio Nue initially considered conducting the Project jointly with a third party and asked toy makers and others to work with them. None of them were used, however, and Defendant Studio Nue subsequently decided to conduct the Project by itself. From the latter half of 1980, they began creating the story structure for the Project as well as the designs for the characters, with S creating the overall story draft and designs for the fighter craft and other mecha that would appear, U creating the designs for the mecha for the spaceship and the enemy army, and V creating the designs for the characters.

Around February or March 1981, Defendant Studio Nue decided to proceed with the Project with the cooperation of Defendant Big West. O, a representative of Defendant Big West at the time, considered broadcasting the Project as a television animation program. For the success of the Project, O thought that it was necessary to sell related character products and magazines simultaneous with the start of television broadcasting and to obtain the cooperation of toy makers and others from an early stage because it would take time to develop toys that transform into robots. Furthermore, from around August 1981, O presented designs and handmade models for mecha appearing in the program created by S and Others to toy and model kit makers to sound out the possibility of selling transforming toys and ask them to be sponsors during the television program, and also negotiated with publishing companies publishing magazines for young children and teenagers to enable publication of serial manga and novels simultaneous with the start of television broadcasting.

Around January 1982, it appeared that Mainichi Broadcasting slots from October of the same year could be secured, and approvals could be obtained by that time from makers of toys, model kits, stationery and candy to sponsor the Project so as to provide broadcasting expenses, so O decided to proceed with making the Project into a television animation program named *Macross*.

b. Creation of the Story and the Original Designs on which the Television Animation Program were based

By around November 1981, S had created rough story notes for all 39 episodes and story configuration tables based on these story notes by February 1982. Subsequently, along with deciding the broadcast slots, the story structure was reduced to 26 episodes, and T made the overall structure based on this (further, it was decided to extend the series after broadcasting started, and ultimately all 36 episodes were included).

S also managed the design of the mecha appearing in the program, and starting in 1981 created the designs for the "Valkyrie" variable fighters used by the main characters. Design drafts for the Valkyrie, which could take the form of a fighter craft or a robot, were created by around December of the same year. Design drafts for the Valkyrie, with a configuration between fighter craft and robot, and other mecha were made by around March 1982. Also, because toy makers and others desired to manufacture multiple toys using the same molds, multiple designs of the Valkyrie with differing specifications and accessories were created and three-dimensional drawings needed for the manufacture of toys and model kits were issued to manufacturers in April 1982.

U managed the design of the mecha appearing in the program, including the giant spaceship "Macross," as well as the creation of related markings, and created draft designs by around March of the same year. Also, in April of the same year U created size comparison tables for mecha designs and Macross three-dimensional drawings, which issued them to manufacturers.

Based on the story structure created by S, V managed the creation of designs for the characters appearing in the program, including "Hikaru Ichijyo," "Lynn Minmay" and "Misa Hayase" and created multiple rough sketches of them by around December 1981. By around January 1982, V had created draft designs of these characters, excluding Hikaru Ichijyo, from February to March of the same year created multiple rough sketches of them with a variety of differing facial expressions, postures and costumes, and at the same time made multiple rough sketches of story boards to establish the characters and the story.

c. Participation of the Plaintiff in Production of the Television Animation Programs

Defendant Studio Nue initially planned to outsource animation of the Project to Artland, with whom it had a cooperative relationship. However, because Artland itself did not have enough animators, around the end of December 1981, O sounded out the Plaintiff, which had a large number of animators, concerning cooperation, and officially requested that the Plaintiff participate in creating animation in April 1982.

The Plaintiff accepted this request. Mainichi Broadcasting wanted to enter into a production agreement with the Plaintiff, which had experience in animation production, from the viewpoint of understanding the production schedule and ensuring progress in the work, so it was decided that these two parties would enter into an agreement concerning production and broadcasting of the Television Animation Programs (as stated above, the agreement was officially exchanged on September 30 of the same year).

Based upon the above agreement with Mainichi Broadcasting, the Plaintiff selected P, one of its employees, as the managing producer of the Television Animation Programs, and entrusted the task of animation to Anime Friend, a wholly-owned subsidary. The initial meeting between the Plaintiff and the Defendants took place on 04/27/1982. Q, the managing producer from Anime Friend, was in attendance and received an explanation on such matters as the details of the Project and the characteristics of the mecha from T, U, S, V and others. Anime Friend started production of the Television Animation Programs from May of the same year.

d. Actual Work for Production of the Television Animation Program
(a) Production work for an animation film consists of such elements as actual configuration (configuration of characters, mecha, color, art, etc.) and story configuration, and based on them, creating scenarios, direction, storyboard creation, drawing (original pictures and moving images), backgrounds, finishing (coloring in animation cells), frame-by-frame filming, film editing, post-recording and background music (setting sounds and music to rush films).

Production of the Television Animation Program was managed by parties including the producer P, the onsite producer Q, the general director R, the series composer T, character designer and character drawing manager V, mechanical designers S and U, sound manager W and mecha drawing manager Z. Below are the actual details of the management activities.

(b) For the Television Animation Program, it was decided to create scripts and storyboards based upon the story structure created by S, model sheets based upon draft designs for mecha and characters appearing in the program, and to draw original pictures and moving images based upon the model sheets. However, because each round of production proceeded in parallel fashion, the managers for script, storyboard and direction, etc. differed for each broadcast. For scripts, Q, R, T and others met with a scriptwriter to create a final manuscript. Storyboards created by managers were decided following checking by R. As stated below, creation of basic model sheets was managed by S and Others themselves or animators under the direction and supervision of S and Others. In other words, (1) S or animators under the direction and supervision of S completed model sheets for mecha appearing in the program such as the fighter craft Valkyrie based upon draft designs created as above, (2) U or animators under the direction and supervision of U completed model sheets for the mecha in the main role, i.e. the giant spaceship Macross, based upon draft designs created as above, and (3) V completed all model sheets for the characters in the program based upon draft designs created as above.

(c) Drawing of the original pictures and moving images based upon the above model sheets was mainly performed by Artland and Anime Friend for creation of the animated portion of the Television Animated Programs.

Also, to avoid discrepancies among staff performing drawing and other activities, V and others proceeded with work by preparing multiple story establishment boards explaining the relationships among the characters appearing in the programs and their relationships to each other. Mechanical and battle scene cuts were ultimately decided by R or by S under the direction of R, and other cuts were ultimately decided by R.

(d) Checking and film editing of post-filming rush films was determined through a final check by R, and post-recording was decided by R, Q, T and others.

(e) The producer P and the onsite producer Q were mainly involved in such matters as negotiations with sponsors, television stations and advertising firms, and did not give instructions concerning actual production.

e. Payment of Production Expenses and Distribution of Profits
(a) In September 1982, Defendant Big West entered into a memorandum with Mainichi Broadcasting concerning broadcasting fees for of the Television Animation Program. Based upon this memorandum, Defendant Big West received payments of advertising fees from toy, model kit, stationery and candy makers, who were the sponsors of the Television Animated Program, and paid a monthly total of 48,000,000 yen (production expenses: 24,050,000 yen, broadcast fees: 22,445,000 and micro expenses: 1,505,000 yen; excluding 5,242,600 yen in Defendant Big West commissions) in broadcasting fees to Mainichi Broadcasting during the broadcast period of the Television Animation Programs on the last day of the month following the broadcast month, and deposited 50,000,000 yen as a guarantee for these payments with Mainichi Broadcasting.

Under the agreement concerning the production and broadcasting of the Television Animation Program entered into between the Plaintiff and Mainichi Broadcasting (Plaintiff Exhibits 2, 3), it was agreed that Mainichi Broadcasting would obtain exclusive broadcasting rights to the Television Animation Program for two years from the completion of broadcast of the final episode and would be required to pay to the Plaintiff 5,500,000 yen for each episode in the month following delivery as production expenses for the Television Animation Program.

(b) The Plaintiff paid compensation for production work to Anime Friend, Defendant Studio Nue, Artland and others since starting participation in the Television Animation Program in May 1982 (aside from Anime Friend, payment was through Anime Friend). Before broadcasting of the Television Animation Program began, however, the Plaintiff complained to Defendant Big West that production expenses had risen more than initially anticipated and that the above broadcasting fees paid through Mainichi Broadcasting (the source for which were advertising fees received by Defendant Big West from advertisers and others) was insufficient.

In this regard, to compensate for the shortfall for broadcasting expenses, on 10/01/1982 the Plaintiff and the Defendants entered into a memorandum concerning such matters as granting to the Plaintiff part of the profits from merchandising related to the Television Animation Program as well as overseas broadcast syndication rights and merchandising rights (Plaintiff Exhibit 4). Namely, this memorandum stated that (1) Defendant Big West would be the point of contact and exercise rights concerning character merchandising rights and broadcasting syndication for domestic rebroadcasting, the Plaintiff would do the same for rights for publications targeting students up to the sixth year of elementary school, music and overseas broadcasting syndication rights and general merchandising rights, and Defendant Studio Nue would do the same for publications targeting students at the middle school level and above, and

(2) stipulated the distribution ratio of profits for each item between the Plaintiff and the Defendants (profits for domestic merchandising rights would also be distributed to Mainichi Broadcasting, and all profits from overseas exercise of merchandising rights would go to the Plaintiff).

 f. Copyright Markings
 (a) There were articles in student magazines introducing the Television Animation Program from July to October 1982, i.e. before their broadcast, but all of these displayed the joint copyright marks (©) of Defendant Studio Nue and the Plaintiff.

 (b) The opening credits during the broadcast of the Television Animation Program displayed the names of managers from the Defendants and Artland for planning, original work, original work cooperation, series structuring, chief director and set up supervision, including O for planning, Defendant Studio Nue for original work, V for character design and U and S for mechanical design, and P and Q were credited as producers. The opening credits and closing credits credit Mainichi Broadcasting, the Plaintiff and Anime Friend for production (Plaintiff Exhibits *ken* 1 to 3).

 (c) Articles collecting materials and the recollections of staff from the production period of the Television Animation Programs (Defendant Exhibits 1, 2, 8, 18) were published from August to October 1983, with all displaying the joint copyright marks (©) of Defendant Studio Nue and Mainichi Broadcasting. The text of these documents stated that Defendant Studio Nue managed the creation of original work, T managed the series structuring and V managed the character design.

 (d) The 30th anniversary complete works of the Plaintiff (Defendant Exhibit 10) was released in April 1993. While there were no copyright marks for portions of these complete works concerning other television animation programs produced by the Plaintiff, the portions concerning the Television Animation Program display the copyright mark (©) of Defendant Big West. The complete works also states that this is an original story of Defendant Studio Nue, V managed the character design, U and S managed the mechanical design and S also participated in the direction and script.

 (e) A complete history of the animation works of the Plaintiff, published in February 1998 under the Plaintiff's supervision (Defendant Exhibit 3), is broadly divided into a section organizing animation works in chronological order, a section on a certain comedy animation series, and a section on other works. While the works under the first two sections all display the copyright mark of the Plaintiff exclusively or jointly, most works is the final section do not display the copyright marking of the Plaintiff. The Television Animation Programs are classified under the final section, displaying only the copyright mark (©) of Defendant Big West. The complete history also notes such matters as this being the first original work of Defendant Studio Nue, that the mechanical designer S also participated in direction and the script, and that young staff members such as the character designer V also took part.

 (2) Judgment
 a. Whether the primary assertions of the Plaintiff are right or wrong is judged based upon the facts confirmed above.

 The Plaintiff asserts that P and Q were creative contributors to the overall formation of the Television Animation Programs, and these persons created the Television Animation Program in the course of their duties as employees engaged in the business of the Plaintiff, so the Plaintiff has obtained moral rights and copyrights to the Television Animation Programs.

Daiichi Hoki "D1-Law.com precedent system" 10/13

However, as explained below, the assertions of the Plaintiff are groundless.

Namely, as stated above, the main staff involved in the production of the Television Animation Programs were the producer P, the onsite producer Q, the general director R, the series composer T, the character designer and character drawing manager V, the mechanical designers S and U, the music supervisor W and the mechanical drawing managers Z and others. Of these people, the general director R had ultimate responsibility for the workmanship of the entirety of the onsite production work for the Television Animation Programs from creation of scenarios to post-recording and film editing, and made actual ultimate decisions concerning creation of moving images and cutting battle scenes, etc. as well as ultimate decisions on matters including post-production rush film checking and film editing. R is therefore recognized as "creatively contributing to the overall formation" of the Television Animation Programs as the director. In comparison, the producer P and the onsite producer Q were mainly involved in managing such matters as negotiations with sponsors, television stations and advertising firms. They did not have any creative involvement and did not give direction to staff.

b. As stated above, it cannot be said that P and Q contributed to the overall creation of the Television Animation Programs. The assertions of the Plaintiff therefore lack foundation. It therefore cannot be said that the Plaintiff has obtained moral rights or copyrights for the Television Animation Program under the provisions of Article 15(1) of the Copyright Act.

2    Concerning the Secondary Assertions
Next, regarding the secondary assertions, we will focus our consideration on who is the maker of the cinematographic work for the Television Animation Programs.

(1) Factual Findings
This is as stated in 1 (1)

(2) Judgment
a. Concerning the producer of the Cinematographic Work for the Television Animation Programs

(a) O of Defendant Big West worked to secure sponsors and broadcasting slots with television stations for the Television Animation Programs originally planned by Defendant Studio Nue, and when television broadcasting with Mainichi Broadcasting was decided, the Plaintiff, who had experience producing animation, was requested to produce the Television Animation Programs, as desired by Mainichi Broadcasting. After accepting this request, in April 1982 the Plaintiff concluded an agreement with Mainichi Broadcasting to produce the Television Animation Programs (the agreement was entered into in September of that year) and had its subsidiary, Anime Friend, start animation production from May of the same year. Although the staff of Anime Friend, Defendant Studio Nue, Artland and others performed the actual production, the Plaintiff paid all production expenses after it became involved in production. Under the above agreement entered into with Mainichi Broadcasting, the Plaintiff was obligated to produce and deliver the Television Animation Programs in accordance with the delivery schedule agreed upon in this agreement (the Defendants, on the other hand, did not bear such an obligation to Mainichi Broadcasting) and bore responsibility for the progress management and completion of production of the Television Animation Program.

According to the above, the Plaintiff had the intent to produce the Television Animation Program due to its entering into the above production agreement with Mainichi Broadcasting, produced this at its own production expense and its own calculations, and was responsible to Mainichi Broadcasting, which ordered this production, for progress management and completion of the production.

It can therefore be said that the Plaintiff had the initiative and the responsibility to produce the Television Animation Program.

As stated above, the Plaintiff is recognized as the producer of the cinematographic work for the Television Animation Program.

(b) Against this, the Defendants assert that (1) because Defendant Studio Nue planned the Television Animation Program and O of Defendant Big West intended to complete it, it was the Defendants who had the intention to produce the Television Animation Program, and (2) because the production expenses of 5,000,000 yen for each episode paid from Mainichi Broadcasting to the Plaintiff are paid from the 48,000,000 yen in monthly broadcasting fees paid from Defendant Big West to Mainichi Broadcasting, Defendant Big West was responsible for payment of the broadcasting fees. The Defendants therefore assert that Defendant Big West was responsible for the production of the Television Animation Program.

As outlined below, however, all of the assertions of the Defendants are groundless.

To begin with, having the intention to produce a film does not necessarily require planning of the film from the start; it should also be interpreted as including cases of coming to have the intent to produce the film due to the urging of a third party. As stated above, it is recognized that the Plaintiff came to have the intention to produce the Television Animation Program through the above production agreement with Mainichi Broadcasting. The assertions of the Defendants concerning (1) therefore cannot be used.

Furthermore, due to the fact that: the Plaintiff received payments of production expenses from Mainichi Broadcasting from October 1982 (Plaintiff Exhibit 2); payments of production expenses for the Plaintiff were about five months in advance because payments of compensation to staff working on production had been made because directly after production of the Television Animation Program began in May of the same year; payments for the Plaintiff for production of the Television Animation Program were regularly prioritized because Mainichi Broadcasting production expense payments were deferred; and the broadcasting fee portion that the Plaintiff received through Mainichi Broadcasting (the funds for this were advertising fees received by the Defendant Big West Advertising from advertisers and others) was by itself insufficient for the production expenses borne by the Plaintiff, the Plaintiff and the Defendants entered into the above merchandising memorandum (Plaintiff Exhibit 4) to recover these expenses. In light of this and other facts, it is reasonable to judge that the Plaintiff bore the economic risk for production of the Television Animation Program. Accordingly, the assertions of the Defendants concerning (2) above also cannot be used.

b. Promise of Participation

As previously acknowledged, production of the Television Animation Program was managed by the producer P, the onsite producer Q, the general director R, the series composer T, the character designer and character drawing manager V, the mechanical designers S and U, the music supervisor W and the mechanical drawing managers Z and others. However, it should be said that the general director R was the person who contributed creatively to the overall formation of the Television Animation Program, and because R participated in the production as a general director having known that the Plaintiff would produce this based upon the production agreement with Mainichi Broadcasting and received compensation for the production work from the Plaintiff through Anime Friend (Plaintiff Exhibit 8, Defendant Exhibit 22), accordingly it is reasonable to acknowledge that R promised the Plaintiff, who was the producer of the cinematographic work, that it would participate in the production of the Television Animation Program.

c. Summary

==As stated above, it can be said that the Plaintiff obtained the copyrights to the Television Animation Program under Article 29(1) of the Copyright Act.== Although the Defendants criticize the presumption of authorship prescribed in Article 14 of the Copyright Act, this cannot be used in light of the above acknowledgment.

3        The Propriety of the Right to Petition for the Statement of Interference

The Plaintiff requests an injunction against "hindering the Plaintiff from publicly screening the Animation Films 1 to 36 listed in the annexure, and distributing them by means of copies," on the basis that the Defendants' action of bringing a lawsuit against the Plaintiff stating that the Defendants own the copyrights for the designs that serve as the basis of the Television Animation Program is tantamount to interference.

However, because the act of the Defendants to bring a lawsuit claiming that that the Defendants own the copyrights for the designs cannot be deemed as interfering with the exercise of the Plaintiff's copyrights concerning the Television Animation Program, the Plaintiff's assertions on this point are groundless.

4        Conclusion

==As stated above, copyrights pertaining to the Television Animation Program (excluding moral rights) are owned by the Plaintiff.== Accordingly, because the claim of the Plaintiff has grounds to the extent that it seeks affirmation of the copyrights (excluding moral rights), the judgment is rendered as described in the main text that this claim is allowed. Also, the declaration for provisional execution does not apply as it is not appropriate.

29th Civil Division
        (Presiding Judge Toshiaki Iimura, Judge Michiya Enokido, Judge Shin Sano)
(Attachment)
Annexure

2017/11/29 15:20

| | |
|---|---|
| 【判例ＩＤ】 | ２８０８０７１４ |
| 【要旨】 | 1.一　テレビアニメの全体的形成に創作的に寄与した者は、総監督であるとされた事例。<br>　二　テレビアニメの製作に発意と責任を有する者は、Ｘであるとして、Ｘが映画製作者として著作権法２９条の規定により著作権を有するとされた事例。 |
| 【裁判年月日等】 | 平成１５年１月２０日／東京地方裁判所／民事第２９部／判決／平成１３年（ワ）６４４７号 |
| 【著名事件名】 | 超時空要塞マクロス事件 |
| 【事件名】 | 著作権確認等請求事件 |
| 【裁判結果】 | 一部認容、一部棄却 |
| 【上訴等】 | 控訴 |
| 【裁判官】 | 飯村敏明　榎戸道也　佐野信 |
| 【審級関連】 | ＜控訴審＞平成１５年９月２５日／東京高等裁判所／第６民事部／判決／平成１５年（ネ）１１０７号　判例ID：２８０８２７４１ |
| 【参照法令】 | 著作権法　２条　１５条　１６条　２９条 |
| 【出典】 | 判例時報１８２３号１４６頁<br>判例タイムズ１１２３号２６３頁<br>裁判所ウェブサイト掲載判例<br>D1-Law.com判例体系 |
| 【判例評釈】 | 岡邦俊・コピライト５０６号２８～３４頁２００３年６月<br>横山久芳・判例評論５４２号（判例時報１８４６）１８７～１９４頁　２００４年４月１日<br>岡邦俊・コピライト５１８号２８～３４頁２００４年６月 |
| 【重要度】 | ２ |

■28080714
東京地方裁判所
平成１３年（ワ）第６４４７号
平成１５年０１月２０日
原告　株式会社竜の子プロダクション
訴訟代理人弁護士　大野幹憲
同　窪木登志子
同　塩谷崇之

2017/11/29 15:20

同　千代田有子

被告　株式会社スタジオぬえ

被告　株式会社ビックウエスト

被告ら訴訟代理人弁護士　新保克芳

同　國廣正

同　五味祐子

同訴訟復代理人弁護士　池田浩一郎


主文

1　原告と被告らとの間において、別紙目録記載１ないし３６のアニメーション映画につき、原告が著作権（著作者人格権を除く。）を有することを確認する。

2　原告のその余の請求を棄却する。

3　訴訟費用は、１０分し、その９を被告らの、その余を原告の、各負担とする。


事実及び理由

第1　請求

1 原告と被告らとの間において、別紙目録記載１ないし３６のアニメーション映画につき、原告が著作権（著作者人格権及び著作権）を有することを確認する。

2　被告らは、原告が別紙目録記載１ないし３６のアニメーション映画を公に上映し、その複製物により頒布することを妨げてはならない。

第2　事案の概要

本件は、原告が被告らに対し、別紙目録記載１ないし３６のアニメーション映画（以下「本件テレビアニメ」という。）について、原告が著作権を有することの確認、及び原告が本件テレビアニメを公に上映すること等の妨害行為の差止を求めている事案である。

1　争いのない事実等

(1)　原告は、アニメーション映画制作会社であり、昭和４０年ころから「宇宙エース」、「マッハGoGoGo」、「おらぁグズラだと」、「ハクション大魔王」「昆虫物語みなしごハッチ」、「科学忍者隊ガッチャマン」などのアニメーション映画を製作し、公表してきた。

被告株式会社スタジオぬえ（以下「被告スタジオぬえ」という。）は、作家、画家、漫画家等のための渉外、経理事務、取材等の代行業務等を行う企画会社である。

被告株式会社ビックウエスト（以下「被告ビックウエスト」という。）は、テレビ、ラジオの宣伝映画等の企画及び製作等を業とする会社である。

(2) 原告と株式会社毎日放送（以下「毎日放送」という。）は、昭和５７年９月３０日（第１話ないし第２１話に関する）及び昭和５８年３月１０日（第２２話ないし第３６話に関する）、本件テレビアニメの制作及び放送に関する契約を締結した（甲２、３）。本件テレビアニメは、昭和５７年１０月３日から昭和５８年６月２６日まで、毎日放送をキー局としてテレビ放映さ

れた。

　上記契約に係る契約書には、原告は、毎日放送に対して、同契約で定めた納品スケジュールに従って、本件テレビアニメを制作し、納品する義務を負い、原告が同義務に違反した場合は、毎日放送は上記契約を解約し、損害賠償をすることができる旨記載されている。

　２　主要な争点

　(1)　原告は、著作権法（以下「法」という。）１５条１項の規定により、本件テレビアニメについての著作者人格権及び著作権を取得したか。

　(2)　原告は、法２９条１項の規定により、本件テレビアニメについての著作権を取得したか。

第３　争点に関する当事者の主張

（原告の主張）

　１　主位的主張（法１５条１項による著作者人格権及び著作権の取得）

　(1)　根拠法条

　法１５条１項は、「法人その他使用者・・・の発意に基づきその法人等の業務に従事する者が職務上作成する著作物（プログラムの著作物を除く。）で、その法人等が自己の著作の名義の下に公表するものの著作者は、・・・その法人等とする。」旨規定する。

　(2)　創作者

　本件テレビアニメにおいて、「その映画の著作物の全体的形成に創作的に寄与した者」は、プロデューサーであるＰ及び現場での製作プロデューサーのＱである。同人らは、原告の業務に従事する者として、本件テレビアニメを職務上作成した。

　なお、本件テレビアニメの創作に、被告ビッグウエスト、被告スタジオぬえ、訴外アートランド所属のスタッフが、参画していたとしても、いずれも、「その映画の著作物の全体的形成に創作的に寄与」する行為を担当したことはない。

　(3)　公表名義

　本件テレビアニメは、原告が自己の著作名義の下の公表を予定するものであり、実際にも、原告の著作名義の下で公表された。本件テレビアニメの各話のクレジットでは、「製作　　毎日放送、タツノコプロ、アニメフレンド」と表示され、被告らの表示はなく、また、このような製作者の表示に対して、被告らから異議が述べられたこともない。

　(4)　結論

　したがって、原告は、法１５条１項の規定により、本件テレビアニメについての著作者人格権及び著作権を取得した。

　２　予備的主張（法２９条１項による著作権の取得）

　(1)　根拠法条

　法２９条１項は、「映画の著作物・・・の著作権は、その著作者が映画製作者に対し当該映画の著作物の製作に参加することを約束しているときは、当該映画製作者に帰属する」と、

法２条１項１０号は、「映画製作者」について「映画の著作物の製作に発意と責任を有する者」と、それぞれ規定する。

(2) 映画製作者

本件テレビアニメについての映画製作者は、以下のとおり、原告である。すなわち、本件テレビアニメの制作は、毎日放送との契約（甲２、３）に基づき、原告の判断により行われたものであり、この契約は、原告が制作した本件テレビアニメを毎日放送が日本国内において独占的にテレビジョン放送する権利を取得することを前提として成り立っており、「本映画の制作・・・にかかわる著作権、など一切の諸権利に対する処置については」すべて原告の責任と負担において行うことが契約上明記されている（第８条）。また、本件テレビアニメの制作費用は、毎日放送から支払われる費用（１話５５０万円。ただし、その支払は本件テレビアニメの放映後である。）を除いて、すべて原告が負担し、被告らは全く負担していない。原告は、本件テレビアニメの制作のため、延べ２００名以上の制作スタッフを雇い入れたが、これらの制作スタッフへの報酬は、すべて原告が支払った。このように、原告は、本件テレビアニメの制作に要する経済的な負担を究極的に負っていた。

以上のとおり、本件テレビアニメの製作に発意と責任を有する映画製作者は原告である。

(3) 参加の約束

仮に、本件テレビアニメを創作した者が、前記ＰやＱではなく、それ以外の者、例えば、Ｒであったとしても、その者は、映画製作者である原告に対して、本件テレビアニメの製作に参加することを約束しているから、原告は、本件テレビアニメに係る著作権を取得した。

なお、原告と被告らは、本件テレビアニメの著作権が原告に帰属することを前提として、著作権から生ずる諸権利及び利益の分配に関する覚書（甲４）を締結しており、被告らは、当初から原告に本件テレビアニメの著作権が帰属することを認識していた。

(4) 結論

したがって、原告は、法２９条１項の規定により、本件テレビアニメについての著作権を取得した。

（被告らの反論）

1  主位的主張（法１５条１項による著作者人格権及び著作権の取得）に対して

(1) 認否

原告の主張は否認する。

(2) 創作者

本件テレビアニメにおいて、「その映画の著作物の全体的形成に創作的に寄与した者」は、アートランドのＲや、その他の被告らの業務に従事する者である。Ｒらは、以下のとおり、被告らの業務に従事する者として、本件テレビアニメを創作した。

本件テレビアニメにおいて、ストーリーの構成案や作品イメージ、主要なキャラクターのオリジナルデザインは、原告がアニメの制作作業に参加する前に完成していた。被告らは、当

2017/11/29 15:20

初アニメ制作のための作業をアートランドに行わせることを予定していたが、連続放送となると経験のないアートランド単独では困難であることから、具体的なアニメ化の作業のために、原告の参加を求めたにすぎない。

　そして、原告がアニメの制作作業に参加した後、本件テレビアニメを総監督して指揮したのは、Rであり、アニメ設定画を作成したのは、ほとんど被告スタジオぬえの従業員であるSらであって、原告や原告の子会社であるアニメフレンドから指示等を受けたことはない。

　(2)　公表名義

　本件テレビアニメは、原告が自己の著作名義の下の公表を予定するものではない。本件テレビアニメについての著作権者の表示である表示は、被告ビックウエストの「ビックウエスト」となっている（乙１、２、８、１０）。

　(3)　結論

　以上のとおり、被告らが、本件テレビアニメについて、著作者人格権及び著作権を取得した。

　2　予備的主張（法２９条１項による著作権の取得）に対して

　(1)　認否

　原告の主張は否認する。

　(2)　映画製作者

　本件テレビアニメは、以下のとおり、被告ビックウエストと被告スタジオぬえが、共同の発意と責任で製作したものである。

　すなわち、本件テレビアニメの企画は、被告スタジオぬえの構想を知った被告ビックウエストの前社長Oがこれを完成しようとしたことから始まり、被告らが、スポンサーや放映先の決定、題名の決定等をした。したがって、本件テレビアニメの製作を「発意」したのは被告らである。

　また、被告ビックウエストは、スポンサーから広告料の支払を受け、本件テレビアニメの放映期間中、毎日放送に対し、毎月合計４８００万円（制作費２４０５万円、電波料２２４４万５０００円、マイクロ費１５０万５０００円。ただし、被告ビックウエストの手数料５２４万２６００円を控除する。）の放映料を支払い（乙５）、その支払の保証として、毎日放送に５０００万円を預託した（乙６の第２条）。毎日放送は、原告に対して１話につき５５０万円の制作費（甲２、３）を支払っているが、それも、被告ビックウエストが支出した上記４８００万円の中から出されている。

　このように、毎日放送に対して毎月４８００万円の放映料を支払う責任を負っていたのは被告ビックウエストであり、スポンサーから入金を受けなかった場合の危険は、被告ビックウエストが負っていた。スポンサーに対する関係で、本件テレビアニメの完成と放映の「責任」を負っていたのも、被告ビックウエストである。

　(3)　参加の約束

　前記のとおり、本件テレビアニメについて、「その映画の著作物の全体的形成に創作的に寄与した者」は、アートランドのＲらであるが、同人らが、原告に対して、本件テレビアニメの製作に参加することを約束したことはない。

　なお、本件テレビアニメについての著作権者の表示である表示は、「ビックウエスト」とされているから、法１４条に基づき、被告ビックウエストが著作者と推定されるべきである。

第3　当裁判所の判断

　1　主位的主張について

　まず、主位的主張について、本件テレビアニメについて、その全体的形成に創作的に寄与した者が誰であるかを中心に検討する。

　(1)　事実認定

　前記争いのない事実等に証拠（甲１ないし４、７ないし９、１２、１８、乙１ないし１０、１３ないし１６、１８、１９、２１ないし２５、検甲１ないし３、なお、枝番号の表示を省略する。）及び弁論の全趣旨を総合すれば、以下のとおりの事実を認めることができ、これを覆すに足りる証拠はない。

　ア　本件企画の経緯

　被告スタジオぬえは、昭和５５年ころ、巨大な宇宙艦の中に民間人を住まわせ、宇宙艦の内外で巨大宇宙人軍との宇宙戦争を行うことなどを内容とし、戦闘の主役となる戦闘機に、従来のものとは異なる変形メカを使用することなどを特徴とする新しいアニメ作品の制作を企画して、代表者であるＴ、並びに従業員であるＳ及びＵらがチームを組んでその制作に着手した（以下、この企画を「本件企画」という。）。また、Ｓは、友人のＶ（以下Ｓ及びＵと併せて「Ｓら３名」という。）が作成した人物キャラクターの作画に注目し、Ｖに、被告スタジオぬえと協力関係にあるアートランド在籍のまま、本件企画の実施を担当させた。

　被告スタジオぬえは、当初、第三者と共同で本件企画を実施することを考え、玩具メーカー等に協力を求めたが、採用されなかったため、その後は単独で本件企画の実施をすることとした。そして、昭和５５年後半から、Ｓが、全体のストーリー案の作成及び戦闘機を中心とする登場メカの図柄等を、Ｕが、登場メカのうち宇宙艦や敵軍の図柄等を、Ｖが、登場人物の図柄等を、それぞれ作成して、本件企画のストーリー構成及び登場人物等の図柄の制作を開始した。

　昭和５６年２、３月ころ、被告スタジオぬえは、本件企画について、被告ビックウエストの協力を得て、進めることになった。被告ビックウエストの当時の代表者であったＯは、本件企画をテレビアニメ作品として放映することを考えた。Ｏは、本件企画を成功させるためには、テレビ放映開始と同時に関連するキャラクター製品や雑誌等を販売すること、さらに、ロボットに変形する玩具等の開発のために時間を要するため、早くから玩具メーカー等の協力を得ることが必要であると考えた。そして、Ｏは、昭和５６年８月ころから、玩具メーカー及びプラ

モデルメーカーに対し、Ｓら３名が作成した登場メカの図柄や手作りの見本を示して、変形する玩具等の販売の可能性について打診して、テレビ放映時にスポンサーとなるよう要請したりし、また、幼児誌及び学年誌を発行する出版社に対して、テレビ放映開始と同時にマンガや小説の連載をすることができるよう交渉した。

　Ｏは、昭和５７年１月ころ、毎日放送の放送枠を同年１０月以降確保できる見通しが立ち、また、そのころまでに、玩具、プラモデル、文具及び菓子のメーカー等から本件企画のスポンサーとなる承諾が得られ、放送費用を調達する目途が立ったことから、本件企画のテレビアニメ化を進めることを決定し、題名を「マクロス」とすることにした。

　　イ　本件テレビアニメの基になるストーリー及び原図柄の作成

　Ｓは、昭和５６年１１月ころまでに全３９話分のおおまかなストーリーメモを作成し、昭和５７年２月までに、このストーリーメモを基にストーリー構成表を作成した。その後、放送枠の決定に伴い、エピソードを減らすなどして２６話のストーリー構成とし、これに基づいてＴがシリーズ全体の構成を行った（なお、放映開始後に延長が決定され、最終的に全３６話の構成となった。）。

　Ｓは、登場メカの図柄の作成も担当し、昭和５６年以降、主人公らが使用する、「バルキリー」と呼ばれる変形可能な戦闘メカの図柄の作成作業を進め、同年１２月ころまでに、飛行機の形態及びロボットの形態の「バルキリー」について、原図柄を作成した。飛行機とロボットの中間形態の「バルキリー」やその他のメカについても、昭和５７年３月ころまでにその原図柄を作成した。また、玩具メーカー等から、同一の金型を使用して複数の玩具を製造したいとの要望があったことから、仕様や装備が異なる複数の「バルキリー」の図柄を作成し、同年４月には、玩具やプラモデルの製造に必要な三面図をメーカーに交付した。

　Ｕは、巨大宇宙艦「マクロス」やその他の登場メカの図柄及びマーク類について作成を担当し、同年３月ころまでにその原図柄を作成した。また、同年４月には、各種メカの図柄のサイズの対比表や「マクロス」等の三面図を作成して、メーカーに交付した。

　Ｖは、Ｓが作成したストーリー構成を基に、「一条輝」、「リン・ミンメイ」、「早瀬未沙」等の登場人物の図柄の作成を担当し、昭和５６年１２月ころまでにはそのラフ・スケッチを多数作成し、昭和５７年１月ころまでに、「一条輝」を除く登場人物の原図柄を作成し、同年２月から３月にかけて、登場人物について様々な表情、姿勢、衣装を変えたラフ・スケッチを多数作成し、同じころ、人物像の設定やストーリーの設定を行うためのストーリー設定ボードのラフスケッチを多数作成した。

　　ウ　原告の本件テレビアニメ制作への参加

　被告スタジオぬえは、当初、本件企画のアニメーション化の作業を、協力関係にあるアートランドに委託することを予定していた。しかし、アートランドだけではアニメーターの数が足りないので、Ｏは、昭和５６年１２月末ころ、多数のアニメーターを擁する原告に対して協力方を打診し、昭和５７年４月、アニメーション制作作業への参加を正式に依頼し、原告は、

これを受けることにした。毎日放送は、制作スケジュールの把握や作業の督促などの観点から、アニメ制作の実績のある原告との制作契約を希望したため、本件テレビアニメの制作及び放送に関する契約は、原告と毎日放送とを当事者として締結されることになった（ただし、前記のとおり、正式に契約書を交わしたのは、同年９月３０日である。）。

原告は、毎日放送との前記契約に基づき、本件テレビアニメの担当プロデューサーとして、原告に所属していたＰを選任し、原告の１００パーセント子会社であるアニメフレンドに対し、アニメ化の作業を担当させることとした。原告と被告らとの最初の打合せは、昭和５７年４月２７日に行われ、アニメフレンドから担当プロデューサーとなるＱがこれに出席し、Ｔ、Ｕ、Ｓ、Ｖらから、本件企画の内容やメカの特徴等についての説明を受けた。アニメフレンドは、同年５月以降、本件テレビアニメの制作を開始した。

エ　本件テレビアニメの制作の具体的な作業

(ア)　アニメーション映画の制作作業は、具体的な設定（キャラクター設定、メカ設定、色彩設定、美術設定などの設定）やストーリー構成、これに基づくシナリオの作成、演出、絵コンテ作成、作画作業（原画、動画）、背景、仕上（セル画に色を塗る作業）、フィルムによる１コマ割撮影、フィルム編集、アフレコ、劇伴（ラッシュフィルムに音や音楽を合わせる作業）などから構成される。

本件テレビアニメの制作は、プロデューサーのＰ、現場プロデューサーのＱ、総監督のＲ、シリーズ構成者のＴ、キャラクターデザイナー兼キャラ作画監督のＶ、メカニックデザイナーのＳ及びＵ、音響監督のＷ、メカ作画監督のＺらが担当することになった。実際の具体的担当内容は、以下のとおりである。

(イ)　本件テレビアニメにおいては、Ｓが作成したストーリー構成に基づいて脚本及び絵コンテを作成する作業、並びに登場メカや登場人物の原図柄に基づいて設定画を作り、設定画を基に原画及び動画を描く作画作業その他の作業が行われることになったが、各回の制作が並列的に進められたため、脚本、絵コンテ、演出等の担当者は放映回によって異なった。脚本は、脚本家とＱ、Ｒ、Ｔらが打ち合わせをして決定稿を作成した。絵コンテは、担当者が作成したものをＲがチェックして確定した。基本となる設定画の作成作業については、以下のとおり、Ｓら３名が自ら担当するか又はＳら３名の指揮監督を受けたアニメーターが担当した。すなわち、〈１〉戦闘機「バルキリー」等の登場メカの設定画については、Ｓが、前記のとおり作成した原図柄に基づいて、自ら又はＳの指揮監督を受けたアニメーターがこれを完成させ、〈２〉主役メカである巨大宇宙艦「マクロス」等の設定画については、Ｕが、前記のとおり作成した原図柄に基づいて、自ら又はＵの指揮監督を受けたアニメーターがこれを完成させ、〈３〉登場人物の設定画については、Ｖが、前記のとおり作成した原図柄に基づいて、Ｖ自身がすべて完成させた。

(ウ)　上記設定画を基に原画及び動画を描く作画作業は、主としてアートランド及びアニメフレンドにおいて行われ、本件テレビアニメのアニメーション部分が作成された。また、Ｖ

らは、作画作業等を行うスタッフらの間に齟齬が生じないよう、登場人物の人物像や登場人物相互の関係等を説明するストーリー設定ボードを多数作成して、作業を進めた。作画については、メカニックや戦闘シーンのカットは、Ｒが自ら、又は同人から指示されたＳが最終的な決定をし、その他のカットは、Ｒが最終的な決定をした。

(エ)　撮影後のラッシュフィルムのチェックやフィルム編集は、Ｒが最終的なチェックをして決定し、アフレコは、Ｒ、Ｑ、Ｔらが立会った上、決定した。

(オ)　プロデューサーであるＰ及び現場プロデューサーであるＱは、主として、スポンサー、テレビ局、広告代理店との交渉等を担当して、制作の具体的な内容について指示を与えたことはなかった。

オ　制作費の支払及び利益の配分

(ア)　被告ビックウエストは、昭和５７年９月、毎日放送と本件テレビアニメの放映料に関する覚書を締結した。被告ビックウエストは、この覚書に基づき、本件テレビアニメのスポンサーである玩具、プラモデル、文具及び菓子のメーカー等から広告料の支払を受け、本件テレビアニメの放映期間中、放送の翌月末日に、毎日放送に対し、月額４８００万円（制作費２４０５万円、電波料２２４４万５０００円、マイクロ費１５０万５０００円。ただし被告ビックウエストの手数料５２４万２６００円を控除する。）の放映料を支払い、また、毎日放送に対し、支払の保証として５０００万円を預託した。

原告と毎日放送との間で締結された本件テレビアニメの制作及び放送に関する契約（甲２、３）によれば、毎日放送は、最終話の放送終了から２年を経過するまでの間、本件テレビアニメの独占的放送権を取得すること、毎日放送は、原告に対し、本件テレビアニメの制作費として１話につき５５０万円ずつを納品の翌月に支払う義務を負うことが合意された。

(イ)　原告は、本件テレビアニメの制作に参加した昭和５７年５月以降、アニメフレンド、被告スタジオぬえ、アートランド等に対して、制作作業に対する報酬を支払っていた（アニメフレンド以外は、アニメフレンドを通じて支払っていた。）が、本件テレビアニメの放映開始前ころ、被告ビックウエストに対して、当初の予定よりも制作費用が嵩み、毎日放送を通して支払われる前記放映料分（その原資は、被告ビックウエストが広告主等から受け取る広告料）では不十分である旨を訴えた。

そこで、原告と被告らは、昭和５７年１０月１日、制作費の不足分を補うために、本件テレビアニメについて商品化事業の利益の一部並びに海外における番組販売権及び商品化権を原告に与えることなどを内容とする覚書（甲４）を締結した。すなわち、上記覚書によれば、〈１〉キャラクター等の商品化権及び国内再放送のための番組販売については被告ビックウエストが、小学６年生までを対象とする出版物、音楽並びに海外における番組販売権及び一般商品化権については原告が、中学生以上を対象とする出版物については被告スタジオぬえが、それぞれ窓口となって権利行使をすること、また、〈２〉対象ごとに、原告と被告らの間で利益を配分する比率を定めること（国内の商品化権については毎日放送にも利益が配分され、海外

における商品化権行使等による利益は、原告がすべて取得した。）とされた。

カ　著作権等の表示

(ア)　本件テレビアニメ放映前の昭和５７年７月から同年１０月にかけて、本件テレビアニメの内容等を紹介する記事が学習雑誌等に掲載されたが、これらすべてに、被告スタジオぬえと原告連名の著作権表示（表示）がある。

(イ)　本件テレビアニメ放映時のオープニングクレジットでは、企画はO、原作は被告スタジオぬえ、キャラクター・デザインはV、メカニック・デザインはU及びSであることなど、企画、原作、原作協力、シリーズ構成、チーフディレクター、設定監修については、被告ら及びアートランドの担当者名が表示され、プロデューサーとして、P及びQが表示されている。また、オープニングクレジット及びエンドクレジットの双方において、製作は、毎日放送、原告及びアニメフレンドであることが表示されている（検甲１ないし３）。

(ウ)　昭和５８年８月から同年１０月にかけて、本件テレビアニメの制作時の資料やスタッフの回想等を集めた書籍（乙１、２、８、１８）が発行され、そのすべてに、被告ビックウエストと毎日放送の連名の著作権表示（表示）がある。また、本文中には、被告スタジオぬえが原作を担当したこと、シリーズ構成はT、キャラクターデザインはVであることなどが記載されている。

(エ)　平成５年４月に、原告の３０周年記念全集（乙１０）が発行された。同書中、原告が制作した他のテレビアニメを取り上げた部分には、著作権表示は存しないが、本件テレビアニメを取り上げた部分には、被告ビックウエストの著作権表示（表示）がある。また、本文中には、被告スタジオぬえによる独創的な物語であること、Vがキャラクターデザインを担当したこと、メカニックデザインはU、Sが担当したこと、Sは、演出、脚本にも参加したことなどが記載されている。

(オ)　平成１０年２月に発行された原告監修に係る原告のアニメ大全史（乙３）は、アニメ作品を年代順に整理した部分、一連のギャグ・アニメシリーズを取り上げた部分、及びそれ以外の作品を集めた部分に大別され、前２者に収録された作品には、すべて、単独又は連名で原告の著作権表示があるのに対し、後者に属する作品は、原告の著作権表示のないものが大部分である。本件テレビアニメは後者に分類され、被告ビックウエストの著作権表示（表示）のみがある。また、本文中には、被告スタジオぬえ原作による初のオリジナル作品であること、メカニックデザインのSは演出や脚本にも加わったこと、キャラクターデザインのVその他若手が活躍したことなどが記載されている。

(2)　判断

ア　上記認定した事実に基づいて、原告の主位的主張の当否を判断する。

原告は、P及びQが、本件テレビアニメの全体的形成に創作的に寄与した者であり、同人らは、原告の業務に従事する者として、本件テレビアニメを職務上作成したのであるから、原告が、本件テレビアニメについて著作者人格権及び著作権を取得すると主張する。

　　しかし、原告の主張は、以下のとおり理由がない。

　　すなわち、前記認定のとおり、本件テレビアニメの制作に関与した主なスタッフは、プロデューサーのＰ、現場プロデューサーのＱ、総監督のＲ、シリーズ構成者のＴ、キャラクターデザイナー兼キャラ作画監督のＶ、メカニックデザイナーのＳ・Ｕ、音響監督のＷ、メカ作画監督のＺらであった。このうち、シナリオの作成からアフレコ、フィルム編集に至るまで本件テレビアニメの現場での制作作業全般に関わり、その出来映えについて最終的な責任を負い、実際にも、動画の作成、戦闘シーン等のカットに関する最終的な決定、撮影後のラッシュフィルムのチェック、フィルム編集等に関する最終的な決定を行っていたのは、総監督のＲであるから、同人は、監督として本件テレビアニメの「全体的形成に創作的に寄与した者」に当たると認められる。これに対して、プロデューサーであるＰ及び現場プロデューサーであるＱは、主として、スポンサー、テレビ局、広告代理店との交渉等を担当しており、創作面での具体的な関与はなく、スタッフに対して指示を与えたこともなかった。

　　イ　以上のとおり、Ｐ及びＱは、本件テレビアニメの全体的な創作に寄与したものということができないから、原告の主張は、その前提を欠く。したがって、原告は、法１５条１項の規定により、本件テレビアニメについての著作者人格権及び著作権を取得したとはいえない。

　　２　予備的主張について

　　次に、予備的主張について、本件テレビアニメの映画製作者が誰であるかを中心に検討する。

　　(1)　事実認定

　　１の(1)のとおりである。

　　(2)　判断

　　ア　本件テレビアニメの映画製作者について

　　(ア)　　本件テレビアニメは、もともと被告スタジオぬえが企画したものを、被告ビックウエストのＯがスポンサーの確保やテレビ局での放送枠の確保に努力し、毎日放送でのテレビ放送が決まった段階で、毎日放送の要望によりアニメ制作に実績のある原告に対し制作が依頼された。同依頼を受けて、原告は、昭和５７年４月、毎日放送との間で、本件テレビアニメを制作する旨の契約を締結し（契約書を締結したのは同年９月）、子会社のアニメフレンドをして同年５月からアニメ制作作業を開始させた。実際の制作作業は、アニメフレンド、被告スタジオぬえ、アートランドらのスタッフが行ったが、原告が制作に関与するようになった後は、制作費用はすべて原告が支払った。原告は、毎日放送との間で締結した上記契約により、同契約で合意された納品スケジュールに沿って、本件テレビアニメを制作し、納品する義務を負い（一方、被告らは毎日放送に対して、そのような義務を負担しない。）、本件テレビアニメの制作の進行管理及び完成について責任を負うことになった。

　　以上によれば、原告は、毎日放送と上記制作契約を締結することにより本件テレビアニメの制作意思を有するに至ったものであり、また、自ら制作費用を負担して自己の計算により本

件テレビアニメの制作を行い、本件テレビアニメの制作の発注者である毎日放送に対して、その制作の進行管理及び完成についての責任を負っていたのであるから、原告は、本件テレビアニメの製作に発意と責任を有する者であるということができる。

　以上のとおり、本件テレビアニメの映画製作者は原告であると認められる。

　（イ）　これに対し、被告らは、〈1〉本件テレビアニメを企画したのは被告スタジオぬえであり、被告ビックウエストのOがこれを完成させようとしたのであるから、本件テレビアニメの製作を「発意」したのは被告らである、〈2〉毎日放送から原告に支払われた1話５５０万円の制作費は、被告ビックウエストが毎日放送に支払った放映料月額４８００万円から支払われ、放映料の支払責任は被告ビックウエストが負っていたから、本件テレビアニメの製作に責任を有するのは被告ビックウエストである、と主張する。

　しかし、被告らの主張は、以下のとおり、いずれも理由がない。

　まず、映画の製作に「発意」を有するとは、必ずしも最初にその映画の企画を立案することを要するものではなく、第三者からの働きかけによりその映画を製作する意思を有するに至った場合をも含むものと解すべきであり、原告は、前記のとおり、毎日放送との上記制作契約によって、本件テレビアニメを製作する意思を有するに至ったものと認められる。したがって、被告らの〈1〉に関する主張は採用できない。

　また、原告が毎日放送から制作費の支払を受けたのは、昭和５７年１０月以降であること（甲２）、前記認定のとおり、原告は、同年５月に本件テレビアニメの制作を始めた直後から、制作作業に従事したスタッフに対し報酬を支払っているのであるから、約５か月間、原告の制作費用の支払が先行していること、毎日放送の制作費の支払は、後払いであるから、本件テレビアニメの制作については、常に原告の支払が先行していること、原告が毎日放送を通じて受け取る放映料分（その原資は、被告ビックウエストが広告主等から支払を受ける広告料）だけでは、原告が負担する制作費用として十分でないため、原告は被告らとの間で前記商品化権等に関する覚書（甲４）を締結し、制作費用の回収を図ろうとしていること等の事実に照らすならば、本件テレビアニメの制作に関して経済的な危険を負担しているのは原告であると判断するのが相当である。したがって、被告らの上記〈2〉の主張も採用できない。

　イ　参加の約束について

　前記認定のとおり、本件テレビアニメの制作は、プロデューサーのP、現場プロデューサーのQ、総監督のR、シリーズ構成者のT、キャラクターデザイナー兼キャラ作画監督のV、メカニックデザイナーのS及びU、音響監督のW、メカ作画監督のZらが担当しているが、本件テレビアニメの全体的形成に創作的に寄与したのは、総監督を担当したRであるというべきところ、Rは、原告が毎日放送との制作契約に基づいて本件テレビアニメを制作することを知った上で、総監督として本件テレビアニメの製作に参加しており、制作作業に対する報酬も原告からアニメフレンドを通じて受け取っていたのであるから（甲８、乙２２）、これらの事実によれば、Rは、映画製作者である原告に対し、本件テレビアニメの製作に参加することを約

束していたものと認定するのが相当である。

　　ウ　小括

　以上のとおり、原告は、法２９条１項の規定により、本件テレビアニメについての著作権を取得したといえる。なお、被告らは、法１４条所定の著作者の推定を云々するが、前記認定に照らして採用できない。

　　３　妨害排除請求権の当否

　原告は、「原告が別紙目録記載１ないし３６のアニメーション映画を公に上映し、その複製物により頒布することを妨害する」ことの差止めを求め、その理由として、被告らが、原告に対して、本件テレビアニメの基礎となった図柄に係る著作権が被告らに帰属する旨の訴訟を提起した行為が妨害行為に該当する旨主張する。

　しかし、図柄に係る著作権が被告らに帰属する旨を求めて訴訟提起する被告らの行為が、本件テレビアニメに係る原告の著作権の行使を妨害する行為であると評価することはできないから、原告のこの点の主張は理由がない。

　　４　結論

　以上のとおり、本件テレビアニメに係る著作権（著作者人格権を除く。）は原告に帰属する。よって、原告の請求は、著作権（著作者人格権を除く。）の確認を求める限度で理由があるから、これを認容することとし、主文のとおり判決する。なお、仮執行宣言については、相当でないからこれを付さないこととする。

民事第２９部

　（裁判長裁判官　飯村敏明　裁判官　榎戸道也　裁判官　佐野信）

（別紙）

別紙目録



# TRANSPERFECT

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):  Decision in The Super Dimension Fortress Macross Case., Tokyo District Court, 29th Civil Division, 2001 (Wa) Number 6447, as reprinted in D1-Law.com database.

Source Language(s)  Japanese

Target Language(s)  English

*Authorized Signature:*

*Claire Skrabutenas*

*Executive Project Manager*

*December 8, 2017*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of ___California___ }

County of ___San Francisco___ }

On ___Dec, 8, 2017___ before me, ___Ewan McCloy, Notary Public___,
(Here insert name and title of officer)

personally appeared ___Claire Skrabutenas___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature

(Notary Public Seal)



**EWAN MCCLOY**
Commission No. 2188887
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm Expires MARCH 30. 2021

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

# EXHIBIT C

LATHAM & WATKINS LLP
  Daniel Scott Schecter (Bar No. 171472)
   *daniel.schecter@lw.com*
  Jessica Stebbins Bina (Bar No. 248485)
   *jessica.stebbinsbina@lw.com*
  Elizabeth A. Greenman (Bar No. 308488)
   *elizabeth.greenman@lw.com*
10250 Constellation Boulevard, Suite 1100
Los Angeles, California 90067
Telephone:   (424) 653.5500
Facsimile:   (424) 653.5501

Attorneys for Petitioner
Harmony Gold, USA, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HARMONY GOLD, USA, INC.,<br><br>　　　Petitioner,<br><br>　　　v.<br><br>TATSUNOKO PRODUCTION CO., LTD.,<br><br>　　　Respondent. | CASE NO.  2:17-cv-06034<br><br>**PETITION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

PETITION TO CONFIRM ARBITRATION AWARD
AND FOR ENTRY OF JUDGMENT

Petitioner Harmony Gold, USA, Inc. ("Harmony Gold"), by and through its undersigned counsel, Latham & Watkins LLP, brings this petition to confirm an arbitration award, dated June 28, 2017, in connection with arbitration proceedings between Harmony Gold and Respondent Tatsunoko Production Co., Ltd. ("Tatsunoko") under 9 U.S.C. §§ 1-16, and alleges as follows:

## THE PARTIES

1.      Harmony Gold is a corporation organized and existing under the laws of the State of California with its principal place of business in Los Angeles, California.  Harmony Gold is a citizen of the State of California.

2.      Upon information and belief, Tatsunoko is a limited company organized and existing under the laws of Japan with its principal place of business in Tokyo, Japan.  Tatsunoko is a citizen of the foreign nation of Japan.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper in the United States District Court under 28 U.S.C. §1332(a)(2) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of costs and interest.

4.      Jurisdiction is also proper in the United States District Court pursuant to 9 U.S.C. § 9.

5.      Venue is proper in the United States District Court for the Central District of California pursuant to 9 U.S.C. § 9 and 28 U.S.C. §1391(b)(2) because this is the judicial district in which the arbitration award sought to be confirmed was made.

## FACTUAL ALLEGATIONS

6.      The parties entered into a license agreement dated March 15, 1991 ("License Agreement"), which governs the parties' contractual relationship.  The parties subsequently entered into a number of amendments to the License

Agreement. One of the amendments, dated August 6, 1998 ("1998 Amendment"), contains an agreement to arbitrate any dispute between the parties.

7. The arbitration provision in the 1998 Amendment states as follows:

> This Amendment and the main Agreement will be governed by the laws of the State of California of the United States of America and all disputes shall be resolved by binding arbitration in Los Angeles, California pursuant to the rules of the American Film Marketing Association.[1]

8. A dispute arose between the parties regarding the parties' rights under the License Agreement and its subsequent amendments.

9. Harmony Gold subsequently submitted an arbitration demand with IFTA on November 23, 2016 (IFTA Case No. # 16-75) and Tatsunoko submitted a cross-complaint in that proceeding on December 29, 2016. On February 2, 2017, Jack E. Freedman, Esq. ("Mr. Freedman") was designated as the IFTA arbitrator in the referenced proceedings.

10. Both parties submitted Opening Briefs and Responding Briefs, along with voluminous exhibits, to Mr. Freedman, on May 2 and 9, 2017.

11. The arbitration hearing took place before Mr. Freedman on May 16, 17, 18, and 19, 2017, in Los Angeles, California. Mr. Freedman permitted the parties to present extensive evidence and argument.

12. After the close of arbitration, each party submitted a Post-Hearing Brief and a Request for Attorneys' Fees and Costs on June 5, 2017.

13. Based upon the arbitration briefs, evidence presented at arbitration, exhibits, the relevant case law and the arguments of counsel, Mr. Freedman issued a detailed 21-page arbitration award on June 28, 2017 (the "Arbitration Award").

---

[1] The American Film Marketing Association has since become the Independent Film & Television Alliance ("IFTA").

14.     A true and correct copy of the Arbitration Award is attached hereto as **Exhibit 1**.[2] Harmony Gold has concurrently filed an Application to File Under Seal Certain Portions of Arbitration Award, which is unopposed by Tatsunoko.[3]

15.     This petition is timely because it was filed within one year after the award was made.

## CLAIM FOR RELIEF

16.     Harmony Gold repeats and realleges the allegations in Paragraphs 1 through 14 above as though fully set forth herein.

17.     Pursuant to 9 U.S.C. §§ 9 and 13, the parties are entitled to a judgment entered by this Court to confirm the Arbitration Award.

18.     The Arbitration Award is final and binding on the parties pursuant to the 1998 Amendment.

---

[2] Exhibit 1 will be filed pending resolution of our concurrently filed Application to File Under Seal.

[3] The parties anticipate that they will file a stipulation to confirm the Arbitration Award and a proposed judgment after resolution of the Application to File Under Seal.

## **PRAYER FOR RELIEF**

WHEREFORE, Harmony Gold prays for the following relief:

    a) That the Court enter an Order confirming the Arbitration Award; and

    b) That the Court enter judgment on the award in the form of the proposed judgment.

Dated: August 14, 2017

Respectfully submitted,

LATHAM & WATKINS LLP
Daniel Scott Schecter
Jessica Stebbins Bina
Elizabeth A. Greenman


By  /s/ Jessica Stebbins Bina
    Jessica Stebbins Bina
Attorneys for Petitioner
Harmony Gold, USA, Inc.