# EXHIBIT B

# ORIGINAL

## LICENSE AGREEMENT

TATSUNOKO PRODUCTION CO., LTD.

HARMONY GOLD, LTD.

.4

AGREEMENT

THIS AGREEMENT is entered into this 11th day of September, 1984 by and between

        TATSUNOKO PRODUCTION CO., LTD.
        3-22-12, Minami-cho, Kokubunji-shi,
        Tokyo, Japan

(hereinafter referred to as the Licensor)

        - and -

        HARMONY GOLD, LTD.
        8831 Sunset Boulevard, Suite 300
        Los Angeles, CA 90069 U.S.A.

(hereinafter referred to as the Licensee)

WHEREBY IT IS AGREED as follows:

The Licensor hereby grants exclusively and irrevocably to the Licensee the rights to exploit the animated television programs described below produced and owned by the Licensor on the terms and conditions set out below, which rights include, but are not limited to, television broadcasting, merchandising exploitation, theatrical and nontheatrical exploitation, video devices, sound recording devices and publications.

    PROGRAMS & PARTICULARS

        MACROSS: 1/2 hour X 36 episodes
        MOSPEADA: 1/2 hour X 25 episodes
        THE SOUTHERN CROSS: 1/2 hour X 23 episodes

                TOTAL: 84 episodes

1. TERRITORIES

    ZONE NO. 1: The United States of America, and its territories and possessions, and English-speaking Canada, and English--speaking territories and possessions of Canada.

    ZONE NO. 2: All other English-speaking countries, territories and areas, all German-speaking countries, territories and areas including all Scandinavian countries, territories and areas, and all French-speaking countries, territories and areas.

However, all countries and territories in Asia including Japan shall be excluded from the licensed territories under this Agreement.

2. <u>PERIOD OF LICENSE</u>

   The initial period of license is seven (7) years from the date hereof and the license period shall be renewable at the end of every seven years on the terms and conditions mutually agreed upon. At the Licensee's request, the Licensor shall negotiate with the Licensee reasonably and in good faith so that the Licensor shall grant to the Licensee at least one (1) further seven (7) year license period hereunder. If, for any reason, the Licensor and the Licensee shall not agree upon such terms and conditions, the Licensor shall not license any of the rights licensed to the Licensee hereunder to any other party, or exploit those rights itself, without first providing to the Licensee the exclusive right for thirty (30) days to match terms and conditions that the Licensor is prepared to accept from another party or upon which the Licensor will exploit such right itself. The Licensee shall be required to accept only financial terms and conditions that may be satisfied as easily by one person as by another. The Licensor shall send to the Licensee written notice of each of such terms and conditions.

3. <u>LICENSE FEE</u>

   Zone No. 1: US$4,000.- per episode

   Zone No. 2: US$6,000.- per episode

4. <u>MANNER OF PAYMENT</u>

   Zone No. 1: US$4,000.- X 84 eps. = Total US$336,000.-

   Down payment of US$25,000.- shall be made upon signing this Agreement.

   US$25,000.- - no later than December 31, 1984.

   The balance of US$286,000.- shall be paid in the following installments:

   US$28,600.- - no later than January 31, 1985.

   US$28,600.- - no later than March 15, 1985.

   US$28,600.- - no later than September 30, 1985.

   US$28,600.- - no later than December 31, 1985.

   US$28,600.- - no later than March 31, 1986.

   US$28,600.- - no later than June 30, 1986.

   US$28,600.- - no later than September 30, 1986.

   US$28,600.- - no later than December 31, 1986.

   US$28,600.- - no later than March 31, 1987.

   US$28,600.- - no later than June 30, 1987.

Zone No. 2: US$6,000.- X 84 eps. = Total US$504,000.-

The total sum of US$504,000.- shall be paid in the following quarter-annual installments.

   US$63,000.- - no later than March 31, 1986.

   US$63,000.- - no later than June 30, 1986.

   US$63,000.- - no later than September 30, 1986.

   US$63,000.- - no later than December 31, 1986.

   US$63,000.- - no later than March 31, 1987.

   US$63,000.- - no later than June 30, 1987.

   US$63,000.- - no later than September 30, 1987.

   US$63,000.- - no later than December 31, 1987.

5. **COPYRIGHT**

The Licensor, as the exclusive author and owner of all worldwide copyrights, moral rights and rights of publication in and to the underlying series, grants to the Licensee exploitation of the copyrights in accordance with provisions in this Agreement whereby the Licensee is entitled to present, reproduce, record, publish, release, exhibit, distribute, perform, broadcast, diffuse, display, market, edit, dub, translate, arrange musically, transform, dramatize and otherwise adapt and prepare derivative works based on, advertise, and otherwise dispose of and exploit the underlying series, and any and all versions, characters, stories, settings, titles, music, sound track and effects, animation, artwork and all other components thereof, using any methods or devices of exploitation with limitation as provided in A, B, C of Article 6 herein. The Licensor represents and warrants that the underlying series, and the rights granted to the Licensee, do not and will not infringe upon the rights of any third party, and are and will be free of any right, claim or encumbrance of any third party. The Licensee is authorized to register the transfer of rights and licenses to the Licensee as set forth in this Agreement in any copyright, trademark or other appropriate register in Japan or elsewhere to protect the Licensee's rights and licenses under this Agreement. The Licensor and the Licensee shall be joint owners of copyrights in the underlying series for the territories licensed to the Licensee during the license period and shall take necessary legal measures to protect such copyrights from infringement or copying by any third party including registration of trademarks or copyright, and the use of copyright notices in the joint names of the Licensor and the Licensee. All trademarks utilized by the Licensee in connection with the exercise of its rights under this Agreement, other than the existing titles of the underlying

HG00000094

series, shall belong jointly to the Licensor and the Licensee and utilization of such trademarks shall be automatically renewed at the termination of this Agreement for a reasonable length of period mutually agreed upon unless such termination is due to default on the part of the Licensee. With respect to any new materials created by the Licensee, copyright and all other rights in such materials shall also belong jointly to the Licensor and the Licensee.

6. MERCHANDISING RIGHTS

   The Licensee is the lawful and authorized representative to exercise merchandising rights related to the underlying series in the licensed territories specified in Article 1 herein except for such items and articles as set forth below.

   A. With regard to MACROSS series, die-cast toys and other toys manufactured in Japan by Takatoku Toys and plastic model kits made by Imai Chemical Co. for domestic and overseas markets shall be excluded.

   B. With regard to MOSPEADA series, die-cast toys and other toys manufactured in Japan by Gakken Co. and plastic model kits made by Imai Chemical Co. and/or Arii Works for domestic and overseas markets shall be excluded.

   C. With regard to THE SOUTHERN CROSS series, plastic model kits manufactured in the past by Imai Chemical Co. and/or Arii Works for domestic and overseas markets shall be excluded.

   The Licensor shall not engage in or authorize, except as allowed in A, B and C above, any merchandising exploitation related to the underlying series in any of the territories licensed to the Licensee hereunder at any time during the license period.

7. COMPENSATION FOR MERCHANDISING

   A. In connection with exercise by the Licensee of merchandising rights granted hereunder, as distinguished from any other rights granted hereunder, the Licensee shall pay to the Licensor fifty (50) percent of net revenue after deduction of ten (10) percent of merchandising expenses from the total proceeds actually received by the Licensee in case sales are made directly by the Licensee whereas the Licensee shall pay to the Licensor fifty (50) percent of net revenue without deduction of merchandising expenses provided that sales are made through third parties.

   B. The Licensee shall not be beneficiary of revenues accrued by sales of articles licensed in the past by the Licensor to and produced by Takatoku Toys, Gakken Co., Imai Chemical Co., and Arii Works regardless of whether or not such sales are made inside or outside of Japan.

C. With regard to such articles produced in Japan as not included in the Licensee's schedule of merchandising exploitation, the Licensor may export them individually to markets in the licensed territories hereunder with prior consent of the Licensee who shall have option priority on such articles. In case the Licensor exports such articles in compliance with the aforesaid provision, the Licensee shall not be beneficiary of revenues accrued by such exportation.

D. The Licensee shall pay the Licensor's share of merchandising revenue to the Licensor on a quarter-annual basis, for the period of January 1 through March 31, April 1 through June 30, July 1 through September 30, and October 1 through December 31 of each year, with payment forty-five (45) days after the end of each applicable period, and the Licensee shall make monthly business reports available to the Licensor during the license period.

E. The initial term of merchandising agreement is seven (7) years from the date hereof as provided in Article 2 herein. However, in case the total amount of the Licensor's share of merchandising revenue fails to reach US$120,000.- in the first three and a half years and US$80,000.- in the second three and a half years of the license period, the Licensor shall be entitled to eliminate the merchandising license portion from this Agreement unless the Licensee takes measures acceptable by the Licensor to cure the deficit.

8. SPECIAL PROVISIONS

A. Limiting to German-speaking territories, home video and video disc rights which constitute a part of rights granted hereunder shall be excluded. With regard to publication rights for said territories, the Licensee shall present to the Licensor a project plan including natures and contents of publications in each instance of publication for the Licensor's prior consent and approval.

B. The Licensor is entitled to make an audit in each twelve (12) months after providing the Licensee with advance written notice requesting audit.

C. If the Licensee fails to perform its obligations hereunder, the Licensor is entitled to terminate this Agreement in its entirety or partially merchandising exploitation provisions only without prejudice to any of its rights against the Licensee. Such termination shall be made only after the Licensee's receipt of written notice stating in detail the Licensee's failure. However, the Licensee has the right to confirm and cure the failure within sixty (60) days after receipt of the written notice. Notwithstanding any termination, pre-existing licenses entered into by the Licensee shall not be disturbed in any way.

D. In case any dispute arises between the two parties in connection with this Agreement, it shall be settled with the bona fide efforts on the part of each party. The parties hereto mutually agree that if no settlement is reached after exertion of such efforts, the dispute shall be submitted to the competent court in Tokyo, Japan, whose decision shall be final and binding upon both parties.

E. The Licensee has first refusal right for territories other than countries in Asia, and Zone No. 1 and Zone No. 2 specified in Article 1 herein.

F. This Agreement is subject to force majeure.

9. REEDITION, ALTERATION, AND MODIFICATION

The Licensee is entitled to reedit, alter, or modify any and all the underlying series as the Licensee determines to conform with marketing requirements including addition of different language dialogue, new stories, new sound effects, new music, a new title or titles and credits to personnel utilized by the Licensee in connection with any such activity. However, such reedition, alteration, or modification shall be done in a reasonable manner acceptable by the Licensor which does not detract from the underlying series.

10. ASSIGNMENT AND SUBLICENSE

The Licensee shall have the right to assign, license, delegate, lend or otherwise transfer its rights, options or privileges granted hereunder in whole or in part to any third party, but in no case the Licensee shall transfer its obligations to the Licensor to any third party.

IN WITNESS WHEREOF, the parties hereto signed hereunder to execute this Agreement on the date first above written.

TATSUNOKO PRODUCTION CO., LTD.        HARMONY GOLD, LTD.

_Kenji Yoshida_ (signature)            (signature)

_____         _____